**Michael B. Merchant**, OSB No. 882680
mike.merchant@bhlaw.com
BLACK HELTERLINE LLP
805 S.W. Broadway, Suite 1900
Portland, OR 97205
Telephone: (503) 224-5560
Facsimile: (503) 224-6148

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]


# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION


| | |
|---|---|
| DANNY LEUNG, derivatively on behalf of NIKE, INC., | Case No. 3:24-cv-01195 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9; 15 U.S.C. § 78j(b), 78t(a) and 78t-1; 17 C.F.R. § 240.10b-5 |
| JOHN J. DONAHOE II, MATTHEW FRIEND, CATHLEEN BENKO, TIMOTHY COOK, THASUNDA B. DUCKETT, MÓNICA GIL, ALAN B. GRAF, JR., PETER B. HENRY, TRAVIS A. KNIGHT, MARK G. PARKER, MICHELLE A. PELUSO, JOHN W. ROGERS, JR., and ROBERT SWAN, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| NIKE, INC., | |
| Nominal Defendant | |

Page 1 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Danny Leung ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant NIKE, Inc. ("Nike" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants John J. Donahoe II ("Donahoe"), Matthew Friend ("Friend"), Cathleen Benko ("Benko"), Timothy Cook ("Cook"), Thasunda B. Duckett ("Duckett"), Mónica Gil ("Gil"), Alan B. Graf, Jr. ("Graf"), Peter B. Henry ("Henry"), Travis A. Knight ("Knight"), Mark G. Parker ("Parker"), Michelle A. Peluso ("Peluso"), John W. Rogers, Jr. ("Rogers"), and Robert Swan (collectively, the "Individual Defendants" and together with Nike, the "Defendants") for breaches of their fiduciary duties as directors and officers of Nike, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Donahoe and Friend for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nike, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nike's officers and directors from March 18, 2021, through June 27, 2024, both dates inclusive (the "Relevant Period").

2.      Incorporated in Oregon in 1967, Nike designs, markets, and sells athletic footwear, apparel, equipment, accessories and services internationally. The Company has become one of the most well-known athletic footwear and apparel companies in the world, through its cultivation and ownership of several prominent brands, including NIKE, Jordan, and Converse.

3.      The Company's NIKE brand products are sold through Nike Brand Digital Platforms ("Nike Digital"), retail stores, wholesale partners, distributors and licensees. In addition to selling apparel, athletic equipment, and shoes through the Company's website Nike.com, Nike Digital also features digital platforms that include fitness and activity apps, sport, fitness and wellness content, and digital services and features to improve customer experiences in Nike retail stores.

4.      In 2017, the Company created and implemented the "Consumer Direct Offense Strategy" to help increase direct connections and innovation with consumers. This strategy emphasized using Nike's digital platforms and presence as a way of directly connecting with consumers by "add[ing] greater digital expertise and control in the markets where consumer connections happen." This strategy shift led Nike to report financial results from Nike Digital and Nike's retail stores as "Nike Direct." As the Company implemented this direct-to-consumer strategy, Nike began dropping its sales partners, and by late 2020, had dropped approximately one-third of its sale partners, while also materially decreasing sales to other major retail clients to further move Nike's operations to direct-to-consumer sales.

5.      After the market closed on March 18, 2021, Nike reported its financial results for the third quarter of the 2021 Fiscal Year[1] in a press release that was attached to a current report filed on 8-K with the SEC. The press release featured a statement from Defendant Donahoe which represented that Nike's new direct-to-consumer strategy was successful, stating, that "NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages" and that "[o]ur strategy is working, as we accelerate innovation and create the seamless, premium marketplace of the future." Additionally, Defendant Friend reiterated that "NIKE's brand momentum is as strong as ever and we are driving focused growth against our largest opportunities." The accompanying earnings conference call discussing the financial results for the third quarter of the 2021 Fiscal Year, held after market hours with investors and analysts that same day, featured similar remarks. For instance, Defendant Donahoe emphasized that Nike enjoyed a "unique advantage" to bolster its global brand through the Company's "tremendous success in digital" through Nike's "digital transformation."

6.      After the market closed on June 24, 2021, Nike reported its financial results for the fourth quarter of the 2021 Fiscal Year in a press release that was attached to a current report filed on 8-K with the SEC. The press release featured another statement from Defendant Donahoe which again represented that Nike's new direct-to-consumer strategy was successful, representing that "NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world." Defendant Friend focused

---

[1] Nike's fiscal year ends on May 31 of each calendar year. For the fiscal year beginning on June 1, 2020, until May 31, 2021 (the "2021 Fiscal Year"). For the fiscal year beginning on June 1, 2021, until May 31, 2022 (the "2022 Fiscal Year"). For the fiscal year beginning on June 1, 2022, until May 31, 2023 (the "2023 Fiscal Year"). For the fiscal year beginning on June 1, 2023, until May 31, 2024 (the "2024 Fiscal Year"). For the fiscal year beginning on June 1, 2024, until May 31, 2025 (the "2025 Fiscal Year").

particularly on Nike's digital "strength," stating that "NIKE's brand momentum is a testament to our authentic consumer connections, digital strength and continued operational execution," and that, "[a]s we advance our consumer-led digital transformation, we are building a new financial model that will continue to fuel long-term sustainable, profitable growth for NIKE."

7.      The accompanying earnings conference call discussing the financial results for the fourth quarter of the 2021 Fiscal Year, held after market hours with investors and analysts that same day, featured similar remarks. For instance, Defendant Donahoe reemphasized that the Company's "strong business results proved yet again NIKE's unique competitive advantage." He also boasted that "we are better positioned to drive sustainable long-term growth than we were before the pandemic" and "[o]ur relentless pipeline of innovative products continues to create separation between us and our competition."

8.      Also, during the same earnings call, Defendant Friend addressed the Company's Consumer Direct Offense Strategy, representing that Nike would conduct an "accelerated shift to a more direct member-centric business model" where Nike's revenue "[g]rowth will be led by NIKE Direct and our strategic marketplace partners." Defendant Friend also stated that the Individual Defendants intended NIKE Direct "to represent approximately 60% of the business in fiscal '25, led by growth in digital."

9.      The Individual Defendants continued to represent that Nike's business model, specifically, the direct-to-consumer and Nike Direct facets of the business model, positioned the Company for long-term growth, while simultaneously dismissing the impact of the significant competition from other businesses that Nike faced and continues to face today.

10.     After the market closed on the evening of June 27, 2022, the truth about Nike's struggles to achieve revenue growth began to emerge when the Company released its financial

results for the fourth quarter and full 2022 Fiscal Year. The press release revealed that quarterly revenues were down by 1% from the 2021 Fiscal Year and that quarterly wholesale revenues were also down by 7% from the 2021 Fiscal Year.

11.    The press release also revealed that the Company's quarterly gross margin fell 80 basis points from the 2021 Fiscal Year, citing "higher inventory obsolescence reserves in Greater China and elevated freight and logistics costs," and that the Company's 2022 gross margin increased by 120 basis points from the 2021 Fiscal Year, which significantly missed expectations. Nevertheless, Defendant Donahoe's statement in the press release claimed that even though the Company performed poorly, Nike's "strategy is working" by generating value through "competitive advantages, including [its] pipeline of innovative product[s] and expanding digital leadership." Defendant Donahoe also represented that the Company's investments in Nike Digital, among other things, made the Individual Defendants "very confident in our long-term strategy and our growth outlook."

12.    On this news, the price of Nike's Class B stock fell $7.72 per share, or approximately 7%, from a closing price of $110.50 per share on June 27, 2022, to close at $102.78 per share on June 28, 2022.

13.    Just over three months later, after the market closed on the evening of September 29, 2022, the truth continued to emerge when the Company released its financial results for the first quarter of the 2023 Fiscal Year. The press release revealed that Nike's quarterly revenue rose only a modest 4%, along with more disappointing results, including a 22% decline in new income year-over-year, a 20% decline in diluted earnings per share ("EPS") year-over-year, and a gross margin that was down 220 basis points year-over-year—largely caused by disposing excess product inventory, which was 44% higher than the first quarter of the 2022 Fiscal Year.

14.     On this news, the price of Nike's Class B common stock fell $12.21 per share, or approximately 13%, from a closing price of $95.33 per share on September 29, 2022, to close at $83.12 per share on September 30, 2022.

15.     However, and even after considering the already dismal performance of Nike Direct and the direct-to-consumer strategy, the Individual Defendants continued to represent that the Company's business model was strong over the ensuing year, emphasizing in their disclosures and public statements that, among other things, Nike's "competitive advantages continue to fuel our momentum" and that the Company is well  positioned to "leverage our competitive advantages to not only gain share but also grow the market."

16.      After the market closed on December 21, 2023, the truth continued to emerge when Nike held an earnings conference call to discuss the Company's financial results for the second quarter of the 2024 Fiscal Year, issued that same day via press release. During the call, Defendant Friend conceded that the Company's "[t]otal retail sales across the marketplace fell short of our expectations" and that the Company's digital platforms inside Nike Digital experienced a decline in consumer traffic to competitors due to "higher levels of promotional activity across the marketplace." In light of this bleak reality, Defendant Friend revealed that the Company was "adjusting [its] channel growth plans for the remainder of the year" and "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings over the next 3 years."

17.     On this news, the price of Nike's Class B common stock fell $14.49 per share, or approximately 12%, from a closing price of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

18.     Approximately three months later, on March 21, 2024, after the market closed, the truth continued to emerge when the Company released its financial results for the third quarter of

the 2024 Fiscal Year. The press release disclosed that there were 3% declines year-over-year in both Nike's Europe, Middle East, and Africa ("EMEA") segment and Nike Digital's revenue, and that Nike Direct's revenue only grew a measly 0.4% year-over-year.

19.     The accompanying earnings conference call discussing the financial results for the third quarter of the 2024 Fiscal Year, held after market hours with investors and analysts that same day, further revealed the truth. During the earnings call, Defendant Donahoe conceded that "NIKE is not performing in our potential" despite asserting, shortly before, that "Q3 performed in line with our expectations."

20.     Importantly, he further revealed that the Company decided to reduce relying upon the direct-to-consumer strategy the Individual Defendants had previously heralded, and instead "lean in with our wholesale partners to elevate our brand and grow the total marketplace." To this end, Defendant Donahoe further revealed that the Company instituted a "reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the path of our consumer." Defendant Friend, on the same earnings call, further revealed that "we are prudently planning for revenue in the first half of the fiscal year [2025] to be down low single digits" as the Individual Defendants "shift our product portfolio toward newness and innovation."

21.     On this news, the price of Nike's Class B common stock fell $6.96 per share, or approximately 7%, from a closing price of $100.82 per share on March 21, 2024, to close at $75.37per share on March 22, 2024.

22.     Finally, on June 27, 2024, the truth fully emerged, after the market closed, when the Company released its financial results for the fourth quarter and full 2024 Fiscal Year. The press release disclosed that there were declines by 2% year-over-year in fourth quarter revenues, 8% year-over-year in Nike Direct quarterly revenues, and 10% year-over-year in Nike Digital

quarterly revenues. Additionally, the press release revealed only a small full year revenue growth of approximately 0.3% for the Company for the 2024 Fiscal Year and an insubstantial year-over-year growth of approximately 1% in Nike Direct revenue for the full 2024 Fiscal Year. Despite these meager revenue increases, Nike Digital's full 2024 Fiscal Year revenue actually declined by 3% year-over-year. The accompanying earnings conference call discussing the financial results for the fourth quarter and full 2024 Fiscal Year, held after market hours with investors and analysts that same day, further revealed the truth. During the earnings call, Defendant Donahoe claimed that "fiscal '25 will be a transition year for our business," yet "highlighted the strategic shifts we're taking as a company, including leadership and organization changes" and "making a series of adjustments to position us to compete and win."

23.    Shockingly, on this same call, Defendant Friend disclosed a "more pronounced impact" from negative factors expected to affect the Company in the next fiscal year. Taking into consideration these negative factors, Defendant Friend revealed that the Company's 2025 revenue is anticipated "to be down mid-single digits with the first half down high single digits"—materially worse than what was previously disclosed. When questioned about the significant change in the Company's financial predictions from the previous quarter, Defendant Friend described there was a "more pronounced" decline in the Company's lifestyle product on Nike Digital platforms than anticipated. He continued, by revealing, that as a way to "manage the health of [NIKE'S largest franchises]," the Individual Defendants are preparing to "reduc[e] what we're offering to consumers through our digital channel."

24.    Analysts were shocked and disappointed by the Company's fourth quarter and full 2024 Fiscal Year financial outcomes. Specifically, analysts from Barclays were convinced "[NIKE]'s strategy continues to increase in uncertainty" as to the Company's "large-scale efforts

to reset the business," counting Nike's "redirection back into the wholesale channel." Primarily, the analysts from Barclays stated that "[w]e believe the most recent quarterly results have raised more questions and more uncertainty about the long-term health of the Nike brand." Furthermore, an analyst from Stifel expressed that "[m]anagement['s] credibility is severely challenged, and [the] potential for C-level regime change adds further uncertainty." Reiterating this same opinion of management, Niel Saunders, managing director of GlobalData, stated that Nike's "[m]anagement has tried to sell a story of improvement to investors, but is not prepared to back it up with positive forecasts."

25.     On this news, the price of Nike's Class B common stock fell $18.82 per share, or approximately 20%, from a closing price of $94.19 per share on June 27, 2024, to close at $75.37 per share on June 28, 2024. This was the Company's largest decline since 2001.

26.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

27.     Also, during the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Nike to repurchase its own stock at prices that were artificially inflated

due to the foregoing misrepresentations. Indeed, between April 1, 2021, and February 29, 2024, approximately **106,889,217 shares**[2] of Nike's common stock was repurchased, costing the Company over **$8.75 billion**. As the Company's stock was actually only worth $75.37 per share, the price at which it was trading when markets closed on June 28, 2024, the Company overpaid for repurchases of its own stock by **over $3.5 billion** in total.

28.     In further breach of their fiduciary duties, Defendants Friend, Henry, and Parker engaged in extremely lucrative insider trading while the Company's Class B common stock was trading at artificially inflated prices as a result of the Individual Defendants causing the Company to issue materially false and misleading statements, reaping aggregate personal profits exceeding **$211,339,280**.

29.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

30.     In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO") and its Executive Vice President and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Oregon, Portland Division (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

---

[2] Unless otherwise noted, all emphasis is added.

31.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

32.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

34.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

35.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

36.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

37.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Oregon or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

38.     Venue is proper in this District pursuant 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Company is headquartered in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

39.     Plaintiff is a current shareholder of Nike. Plaintiff has continuously held Nike common stock since March 22, 2021. Plaintiff is a citizen of Canada.

### Nominal Defendant Nike

40.     Nominal Defendant Nike is an Oregon corporation that is headquartered at One Bowerman Drive, Beaverton, Oregon 97005-6453. Nike stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NKE."

### Defendant Donahoe

41.     Defendant Donahoe has served as the Company's CEO and President since January 2020 and as a Company director since 2014. He also serves as a member of the Executive Committee. According to the proxy statement filed with the SEC on July 20, 2023, (the "2023 Proxy Statement"), as of June 30, 2023, Defendant Donahoe beneficially owned 1,435,975 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Donahoe owned approximately $158.5 million worth of Nike Class B common stock as of that date.

42.     For the 2021 Fiscal Year, Defendant Donahoe received $32,920,708 in total compensation from the Company. This included $1,500,000 in salary, $13,600,000 in bonuses, $3,602,980 in stock awards, $5,402,416 in option awards, $4,500,00 in non-equity incentive plan compensation, and $4,315,312 all other compensation. For the 2022 Fiscal Year, Defendant Donahoe received $28,838,060 in total compensation from the Company. This included $1,500,000 in salary, $12,061,812 in stock awards, $6,782,995 in option awards, $4,450,000 in non-equity incentive plan compensation, and $4,043,253 in all other compensation. For the 2023 Fiscal Year, Defendant Donahoe received $32,789,885 in total compensation from the Company. This included $1,500,000 in salary, $13,220,455 in stock awards, $7,247,371 in option awards, $6,770,000 in non-equity incentive plan compensation, and $4,052,059 in all other compensation.

43.     The 2023 Proxy Statement stated the following about Defendant Donahoe:

Mr. Donahoe is President and Chief Executive Officer of NIKE, Inc. and has been a director since 2014.From 2017 to 2019, Mr. Donahoe served as President and Chief Executive Officer of ServiceNow, Inc. ("ServiceNow"), provider of enterprise cloud computing services for global enterprises. From 2008 to 2015, Mr. Donahoe served as President and Chief Executive Officer of eBay, Inc. ("eBay"), provider of the global eBay.com online marketplace and PayPal digital payments platform. Mr. Donahoe joined eBay in 2005 as President of eBay Marketplaces, responsible for eBay's global e-Commerce businesses. Prior to joining eBay, Mr. Donahoe was the Chief Executive Officer and Worldwide Managing Director of Bain & Company from 1999 to 2005, and a Managing Director from 1992 to 1999. Mr. Donahoe is Chairman and a member of the Board of Directors of PayPal Holdings, Inc. In addition to this public company board service, he also serves on the Board of Trustees for The Bridgespan Group. Mr. Donahoe served on the Board of Directors of Intel Corporation from March 2009 to May 2017 and ServiceNow from March 2017 to June 2020.

44.     Upon information and belief, Defendant Donahoe is a citizen of California.

**Defendant Friend**

45.     Defendant Friend has served as the Company's CFO and Executive Vice President since April 2020. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Friend

beneficially owned 238,202 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Friend owned approximately $26.3 million worth of Nike Class B common stock as of that date.

46.      For the 2021 Fiscal Year, Defendant Friend received $11,951,087 in total compensation from the Company. This included $875,000 in salary, $1,260,000 in bonuses, $7,161,045 in stock awards, $1,740,792 in option awards, $900,000 in non-equity incentive plan compensation, and $14,250 in all other compensation. For the 2022 Fiscal Year, Defendant Friend received $7,739,210 in total compensation from the Company. This included $1,056,731 in salary, $1,056,000 in bonuses, $2,783,949 in stock awards, $1,938,030 in option awards, $890,000 in non-equity incentive plan compensation, and $14,500 in all other compensation. For the 2023 Fiscal Year, Defendant Friend received $10,157,239 in total compensation from the Company. This included $1,221,154 in salary, $4,080,045 in stock awards, $2,415,790 in option awards, $2,425,000 in non-equity incentive plan compensation, and $15,250 in all other compensation.

47.      During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Friend made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 3, 2021 | 9,032 | $133.20 | $1,203,062 |
| June 15, 2021 | 7,016 | $131.54 | $922,884 |
| August 3, 2021 | 43,000 | $170.00 | $7,310,000 |
| August 5, 2021 | 3,546 | $171.50 | $608,139 |
| June 13, 2022 | 9,032 | $110.52 | $998,216 |
| August 3, 2022 | 4,139 | $113.42 | 469,445 |
| June 5, 2023 | 9,210 | $107.50 | $990,075 |
| August 3, 2023 | 5,545 | $107.00 | $593,315 |

Page 15 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| June 5, 2024 | 9,350 | $95.10 | $889,185 |

Thus, in total, before the fraud was exposed, Defendant Friend sold 99,870 shares of Company common stock on inside information, for which he received approximately ***$13,984,321*** in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

48.    The Company's website[3], last accessed on July 9, 2024, stated the following about Defendant Friend:

> As EVP & Chief Financial Officer, Matthew Friend leads the company's Finance, Demand & Supply Management, Procurement, and Global Places & Services organizations to drive end-to-end value creation for NIKE, Inc.  Matt joined Nike in 2009 working in Corporate Strategy and Development before becoming Chief Financial Officer of Emerging Markets. Matt later served as Chief Financial Officer of Global Categories, Product and Functions and was subsequently appointed Chief Financial Officer of the Nike Brand. While in this role, he also took on the additional responsibilities of VP, Investor Relations.  Prior to joining Nike, he worked in the financial industry, holding leadership roles in investment banking and mergers and acquisitions at Goldman Sachs and Morgan Stanley. Matt is a board member for United Airlines Holdings, Inc. and holds a bachelor's degree in business administration from the University of California, Berkeley, where he was a pitcher for the baseball team.

49.    Upon information and belief, Defendant Friend is a citizen of Oregon.

**<u>Defendant Benko</u>**

50.    Defendant Benko has served as a Company director since 2018. She also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Benko beneficially owned 10,942 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of

---

[3] https://investors.nike.com/investors/corporate-governance/default.aspx.

trading on June 30, 2023 was $110.37, Defendant Benko owned approximately $1.2 million worth of Nike Class B common stock as of that date.

51.    For the 2021 Fiscal Year, Defendant Benko received $308,659 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $188,969 in stock awards, and $19,690 in all other compensation. For the 2022 Fiscal Year, Defendant Benko received $301,522 in total compensation from the Company. This included $102,069 in fees earned or paid in cash, $179,453 in stock awards, and $20,000 in all other compensation. For the 2023 Fiscal Year, Defendant Benko received $321,890 in total compensation from the Company. This included $101,745 in fees earned or paid in cash, $200,190 stock awards, and $19,995 in all other compensation.

52.    The 2023 Proxy Statement stated the following about Defendant Benko:

Ms. Benko is a former Vice Chairman and Managing Principal of Deloitte LLP ("Deloitte"), an organization that, through its subsidiaries and network of member firms, provides audit, consulting, tax, and advisory services to clients globally. During her nearly 30-year career with Deloitte, Ms. Benko held many leadership roles, several concurrent with her appointment as Vice Chairman and Managing Principal in 2011. From 2015 to 2018, Ms. Benko served as Senior Partner working within the firm's "Digital Giants" practice where she was the senior advisory partner for several digital-native companies. From 2010 to 2014, Ms. Benko served as Chief Digital, Brand, and Communications Officer. Previous to her role as Chief Digital, Brand, and Communications Officer, Ms. Benko held multiple technology and talent management roles, including serving as the company's first Vice Chairman and Chief Talent Officer from 2006 to 2010, its Chief Inclusion Officer from 2008 to 2010, and as Managing Principal, Initiative for the Retention and Advancement of Women, from 2003 to 2009. Ms. Benko led Deloitte's technology sector from 2003 to 2007 and was previously Deloitte's first Global e-Business Leader, a position she held from 1998 to 2002. Ms. Benko is a member of the Board of Directors of SolarWinds Corporation. In addition to this public company board service, she also holds board positions at nonprofits Stanford Institute for Research in the Social Sciences, the International Women's Forum, Santa Clara University's Markkula Center of Applied Ethics, Life Skills for Soldiers, and the National Association of Corporate Directors. She is also on the board of WorkBoard, a privately-held company. Ms. Benko is chair of Harvard Business School/NC's Advisory Council.

53.     Upon information and belief, Defendant Benko is a citizen of California.

**Defendant Cook**

54.     Defendant Cook is the Lead Independent Director of the Board and has served as a Company director since 2005. He also serves as the Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Cook beneficially owned 48,443 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Cook owned approximately $5.35 million worth of Nike Class B common stock as of that date.

55.     For the 2021 Fiscal Year, Defendant Cook received $358,969 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $188,969 in stock awards, and $20,000 in all other compensation. For the 2022 Fiscal Year, Defendant Cook received $349,453 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $179,453 in stock awards and $20,000 in all other compensation. For the 2023 Fiscal Year, Defendant Cook received $365,190 in total compensation from the Company. This included $165,000 in fees earned or paid in cash and $200,190 in stock awards.

56.     The 2023 Proxy Statement stated the following about Defendant Cook:

Mr. Cook is the Company's Lead Independent Director and is the Chief Executive Officer of Apple Inc. ("Apple"). Mr. Cook joined Apple in March 1998 as Senior Vice President of Worldwide Operations and also served as its Executive Vice President, Worldwide Sales and Operations and Chief Operating Officer. Mr. Cook was Vice President, Corporate Materials for Compaq Computer Corporation from 1997 to 1998. Previous to his work at Compaq, Mr. Cook served in the positions of Senior Vice President Fulfillment and Chief Operating Officer of the Reseller Division at Intelligent Electronics from 1994 to 1997. Mr. Cook also worked for International Business Machines Corporation from 1983 to 1994, most recently as Director of North American Fulfillment. Mr. Cook is a member of the Board of Directors of Apple. In addition to this public company board service, he is also a

member of the Board of Directors of the National Football Foundation and Duke University Board of Trustees.

57.    Upon information and belief, Defendant Cook is a citizen of California.

**Defendant Duckett**

58.    Defendant Duckett has served as a Company director since 2019. She also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. According the 2023 Proxy Statement, as of June 30, 2023, Defendant Duckett beneficially owned 6,552 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023, was $110.37, Defendant Duckett owned approximately $723,144.24 worth of Nike Class B common stock as of that date.

59.    For the 2021 Fiscal Year, Defendant Duckett received $308,969 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $188,969 in stock awards, and $20,000 in all other compensation. For the 2022 Fiscal Year, Defendant Duckett received $299,453 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $179,453 in stock awards, and $20,000 in all other compensation. For the 2023 Fiscal Year, Defendant Duckett received $320,190 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $200,190 in stock awards, and $20,000 in all other compensation.

60.    The 2023 Proxy Statement stated the following about Defendant Duckett:

Ms. Duckett is President and Chief Executive Officer of the Teachers Insurance and Annuity Association of America ("TIAA"), a leading provider of financial services in the academic, research, medical, cultural, and governmental fields. Prior to joining TIAA, Ms. Duckett was Chief Executive Officer of Chase Consumer Banking at JPMorgan Chase & Co. ("JPMorgan Chase") from 2016 to 2021. Before that appointment, Ms. Duckett was appointed to various management positions at JPMorgan Chase, including: From 2013 to 2016, Ms. Duckett served as the Chief

Executive Officer of Chase Auto Finance, and From 2004 to 2013, Ms. Duckett held multiple management and consumer lending roles. Prior to joining JPMorgan Chase, Ms. Duckett was Director of Emerging Markets at the Federal National Mortgage Association, or Fannie Mae. Ms. Duckett is Chair of the Otis and Rosie Brown Foundation and serves on the Board of Directors of Brex, National Medal of Honor Museum, and the Robert F. Kennedy Human Rights. She also serves on the Board of Trustees for Sesame Workshop.

61.     Upon information and belief, Defendant Duckett is a citizen of New York.

**Defendant Gil**

62.     Defendant Gil has served as a Company director since 2022. She also serves as a member of the Compensation Committee. According the 2023 Proxy Statement, as of June 30, 2023, Defendant Gil beneficially owned 1,856 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023, was $110.37, Defendant Gil owned approximately $204,846.72 worth of Nike Class B stock as of that date.

63.     For the 2023 Fiscal Year, Defendant Gil received $259,872 in total compensation from the Company. This included $69,780 in fees earned or paid in cash and $190,092 in stock awards.

64.     The 2023 Proxy Statement stated the following about Defendant Gil:

Ms. Gil is Chief Administrative and Marketing Officer, NBCUniversal Telemundo Enterprises ("Telemundo") for Comcast Corp. Prior to her current role, Ms. Gil served as Chief Marketing Officer, Telemundo from 2018 until 2020, and as Executive Vice President, Telemundo, managing Communications and Corporate Affairs and Human Resources from 2017 until 2018. Prior to joining Telemundo, Ms. Gil served as Senior Vice President and General Manager, Multicultural Growth and Strategy of the Nielsen Company ("Nielsen") from 2014 until 2017. Ms. Gil joined Nielsen in 2005 as Vice President, Communications and was subsequently promoted in 2009 to Senior Vice President, Public Affairs and Government Relations. Previously, Ms. Gil served as Senior Vice President for Greer, Margolis, Mitchell and Burns from 2004 until 2005. She also served as Director of Public Affairs and Community Outreach for Telemundo Communications Group, Inc., Los Angeles, from 2001 to 2004. Ms. Gil is a

member of the Board of Directors of the National Women's History Museum and Welcome Tech, Inc.

65.    Upon information and belief, Defendant Gil is a citizen of Florida.

**Defendant Graf**

66.    Defendant Graf served as a director of the Company from 2002 until his resignation on June 1, 2024. During his time at the Company, he served as the Chair of the Audit & Finance Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Graf beneficially owned 195,435 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Graf owned approximately $21.57 million worth of Nike Class B common stock as of that date.

67.    For the 2021 Fiscal Year, Defendant Graf received $318,969 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $188,969 in stock awards.  For the 2022 Fiscal Year, Defendant Graf received $309,453 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $179,453 in stock awards. For the 2023 Fiscal Year, Defendant Graf received $335,190 in total compensation from the Company. This included $135,000 in fees earned or paid in cash and $200,190 in stock awards.

68.    The 2023 Proxy Statement stated the following about Defendant Graf:

Mr. Graf is the former Executive Vice President and Chief Financial Officer of FedEx Corporation ("FedEx"), a position he held from 1998 until his retirement in December 2020. Mr. Graf joined FedEx in 1980 and was Senior Vice President and Chief Financial Officer for FedEx Express, FedEx's predecessor, from 1991 to 1998. Mr. Graf is a member of the Board of Directors of Mid-America Apartment Communities, Inc. In addition to this public company board service, he is also a director of the Indiana University Foundation. Mr. Graf previously served on the Board of Directors of Kimball International Inc., Storage USA, Inc., and Arkwright Mutual Insurance Co.

69.    Upon information and belief, Defendant Graf is a citizen of Tennessee.

**Defendant Henry**

70.    Defendant Henry has served as a Company director since 2018. He also serves as a member of the Audit & Finance Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Henry beneficially owned 4,062 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Henry owned approximately $448,322.94 worth of Nike Class B common stock as of that date.

71.    For the 2021 Fiscal Year, Defendant Henry received $301,469 in total compensation from the Company. This included $105,000 in fees earned or paid in cash, $188,969 in stock awards, and $7,500 in all other compensation. For the 2022 Fiscal Year, Defendant Henry received $296,953 in total compensation from the Company. This included $105,000 in fees earned or paid in cash, $179,453 in stock awards, and $12,500 in all other compensation. For the 2023 Fiscal Year, Defendant Henry received $317,690 in total compensation from the Company. This included $105,000 in fees earned or paid in cash, $200,190 in stock awards, and $12,500 in all other compensation.

72.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Henry made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 20, 2021 | 3,388 | $127.03 | $430,360 |
| December 22, 2021 | 1,787 | $167.97 | $300,162 |

Thus, in total, before the fraud was exposed, Defendant Henry sold 5,175 shares of Company common stock on inside information, for which he received approximately $730,522 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

73. The 2023 Proxy Statement stated the following about Defendant Henry:

Dr. Henry is Class of 1984 Senior Fellow at Stanford University's Hoover Institution, Senior Fellow at Stanford's Freeman Spogli Institute for International Studies, and Dean Emeritus of New York University's Leonard N. Stern School of Business ("Stern"). Dr. Henry assumed the Deanship of Stern in January 2010 and served through December 2017. Prior to joining Stern, Dr. Henry was the Konosuke Matsushita Professor of International Economics at the Stanford University Graduate School of Business. In June 2009, President Obama appointed Dr. Henry to the President's Commission on White House Fellowships. In 2008, Dr. Henry led Barack Obama's Presidential Transition Team in its review of international lending agencies such as the IMF and the World Bank. Dr. Henry is a member of the Board of Directors of Citigroup Inc. In addition to this public company board service, he also serves on the Board of Directors of the National Bureau of Economic Research and the Economic Club of New York and serves on the Advisory Board for Protiviti and Biospring Partners. Dr. Henry is a member of the Council of Foreign Relations and the Economic Advisory Panel of the Federal Reserve Bank of New York. Dr. Henry served on the Board of Directors of General Electric from July 2016 until April 2018 and Kraft Foods Group, Inc. and its predecessor, Kraft Foods Inc., from May 2011 until July 2015.

74. Upon information and belief, Defendant Henry is a citizen of California.

**Defendant Knight**

75. Defendant Knight is the son of the co-founder of the Company, Philip Knight. Phillip Knight currently serves as the Chairman Emeritus of the Board. Defendant Knight has served as a Company director since 2015 and also serves as a member of the Executive Committee. As the Company admits, Defendant Knight was selected to serve as a Company director because he has a significant role in the management of the Class A stock owned by Swoosh, LLC, an entity created by Philip Knight in 2015 to hold the majority of his shares of the Company's Class A common stock. Swoosh, LLC owns 233,500,000 shares of Class A stock, or 76.6% of all outstanding Class A common stock. He also is a beneficiary of the Travis A. Knight 2009

Irrevocable Trust II[4], which owns 41,006,369 shares of the Class A common stock, or 13.5% of all outstanding Class A shares. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Knight beneficially owned 26,903 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on June 30, 2023 was $110.37, Defendant Knight owned approximately $2.97 million worth of Nike Class B common stock as of that date.

76.    For the 2021 Fiscal Year, Defendant Knight received $288,969 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $188,969 in stock awards. For the 2022 Fiscal Year, Defendant Knight received $279,453 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $179,435 in stock awards. For the 2023 Fiscal Year, Defendant Knight received $300,190 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $200,190 in stock awards.

77.    The 2023 Proxy Statement stated the following about Defendant Knight:

Mr. Knight is the President and Chief Executive Officer of the animation studio, LAIKA, LLC ("LAIKA"), which specializes in feature-length films. Mr. Knight has been involved in all principal creative and business decisions at LAIKA since its founding in 2003, serving in successive management positions as Lead Animator, Vice President of Animation, and then as President and Chief Executive Officer in 2009. Mr. Knight was Producer and Director of the feature film Kubo and the Two Strings (2017) which was nominated for an Academy Award and winner of the BAFTA award for Best Animated Film. Mr. Knight has served as Producer and Lead Animator on Academy Award-nominated feature-length films The Boxtrolls (2014) and ParaNorman (2012), for which he won an Annie Award for Outstanding Achievement in Character Animation, and Lead Animator for Coraline (2009). Prior to his work at LAIKA, Mr. Knight held various animation positions at Will Vinton Studios from 1998 to 2002, and as a stop-motion animator for television series, commercials, and network promotions. He has been recognized for his work on the Emmy Award-winning stop-motion animated

---

[4] Defendant Knight, along with other members of his immediate family, are beneficiaries of the Trust.

television series The PJs. Mr. Knight serves on the Board of Directors of LAIKA. He is the son of NIKE's co-founder, Mr. Philip Knight, who currently serves as Chairman Emeritus. In addition to his skills and qualifications described above, Mr. Travis Knight was selected to serve on the Board because he has a significant role in the management of the Class A Stock owned by Swoosh, LLC, strengthening the alignment of the Board with the interests of NIKE shareholders.

78.     Upon information and belief, Defendant Knight is a citizen of Oregon.

**Defendant Parker**

79.     Defendant Parker is the Executive Charmain of the Board and has served as a Company director since 2006. He previously served as the Company's President and CEO from 2006 until January 2020. Additionally, Defendant Parker serves as the Chair of the Executive Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Parker beneficially owned 3,212,383 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023, was $110.37, Defendant Parker owned approximately $354.6 million worth of Nike stock as of that date.

80.     For the 2021 Fiscal Year, Defendant Parker received $24,477,982 in total compensation from the Company. This included $1,700,000 in salary, $12,040,000 in bonuses, $6,002,675 in option awards, $4,500,000 in non-equity incentive plan compensation, and $3,235,307 in all other compensation. For the 2022 Fiscal Year, Defendant Parker received $11,834,368 in total compensation from the Company. This included $1,134,615 in salary, $2,153,362 in option awards, $4,450,000 in non-equity incentive plan compensation, and $4,096,391 in all other compensation. For the 2023 Fiscal Year, Defendant Parker received $9,938,812 in total compensation from the Company. This included $1,000,000 in salary, $2,300,765 in option awards, and $6,638,047 in all other compensation.

81. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Parker made the following sales of Company Class B common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 26, 2021 | 114,094 | $130.67 | $14,908,662 |
| July 8, 2021 | 140,000 | $160.16 | $22,422,400 |
| October 13, 2021 | 100,000 | $155.21 | $15,520,500 |
| November 2, 2021 | 100,000 | $167.57 | $16,757,000 |
| November 3, 2021 | 60,000 | $171.53 | $10,291,800 |
| December 30, 2021 | 18,959 | $170.00 | $3,223,086 |
| January 7, 2022 | 81,041 | $158.95 | $12,881,710 |
| January 26, 2022 | 100,000 | $145.99 | $14,599,300 |
| February 14, 2022 | 60,000 | $141.93 | $8,515,800 |
| April 6, 2023 | 110,000 | $119.25 | $13,117,500 |
| May 12, 2023 | 110,000 | $120.86 | $13,294,600 |
| July 18, 2023 | 110,000 | $108.58 | $11,943,800 |
| October 16, 2023 | 58,091 | $99.60 | $5,785,863 |
| February 14, 2024 | 168,378 | $105.00 | $17,679,690 |
| May 14, 2024 | 168,378 | $93.14 | $15,682,726 |

Thus, in total, before the fraud was exposed, Defendant Parker sold 1,498,941 shares of Company common stock on inside information, for which he received approximately *$196,624,437* in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

82. The 2023 Proxy Statement stated the following about Defendant Parker:

Mr. Parker is Executive Chairman of the Board of Directors of the Company. He served as President and Chief Executive Officer of the Company from 2006 to January 2020. Mr. Parker has been employed by NIKE since 1979 with primary responsibilities in product research, design and development, marketing, and brand management. Mr. Parker was appointed: President and Chief Executive Officer in 2006, President of the NIKE Brand in 2001, Vice President of Global Footwear in

1998, General Manager in 1993, Corporate Vice President in 1989, and Divisional Vice President in charge of product development in 1987 Mr. Parker is Chairman of the Board of Directors of The Walt Disney Company. In addition to his skills and qualifications described above, Mr. Parker was selected to serve on the Board because the experience gained while serving as the Company's Chief Executive Officer makes his position as Executive Chairman of the Board instrumental.

83.     Upon information and belief, Defendant Parker is a citizen of Oregon.

**Defendant Peluso**

84.     Defendant Peluso has served as a Company director since 2014. She also serves as the Chair of the Sustainability & Governance Committee and as a member of the Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Peluso beneficially owned 25,777 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on June 30, 2023 was $110.37, Defendant Peluso owned approximately $2.85 million worth of Nike Class B common stock as of that date.

85.     For the 2021 Fiscal Year, Defendant Peluso received $328,969 in total compensation from the Company. This included $120,000 in salary, $188,969 in stock awards, and $20,000 in all other compensation. For the 2022 Fiscal Year, Defendant Peluso received $319,453 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $179,453 in stock awards, and $20,000 in all other compensation. For the 2023 Fiscal Year, Defendant Peluso received $422,330 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $200,190 in stock awards.

86.     The 2023 Proxy Statement stated the following about Defendant Peluso:

Ms. Peluso is Executive Vice President and Chief Customer Officer at CVS Health and Co-President, Pharmacy and Consumer Wellness, responsible for leading the front store retail business, transforming the enterprise's consumer experience, and leveraging marketing to ensure CVS Health becomes the leading health solutions company for consumers. Prior to joining CVS Health, Ms. Peluso was Senior Vice

President, Digital Sales and Chief Marketing Officer at IBM from 2016 to 2021. She oversaw marketing and brand strategy and execution, digital sales, and the commercial business, globally. She was also responsible for the company's client experience. Prior to her work at IBM, Ms. Peluso served as Chief Executive Officer of online shopping destination Gilt Groupe, Inc. ("Gilt") from 2013 until its sale to Hudson's Bay Company in February 2016 and was on Gilt's Board of Directors from 2009 to 2016. From 2009 to 2013, Ms. Peluso served as Global Consumer Chief Marketing and Internet Officer of Citigroup Inc. From 2002 to 2009, Ms. Peluso held senior management positions at Travelocity.com LP ("Travelocity"), being appointed Chief Operating Officer in March 2003, and President and Chief Executive Officer in December 2003. Prior to joining Travelocity, in 1999 Ms. Peluso founded Site59, an online travel site, serving as its Chief Executive Officer until its acquisition by Travelocity in 2002. Ms. Peluso is a member of the Board of Directors at the Ad Council and is on the Executive Council of the Board of Directors of the Association of National Advertisers.

87.     Upon information and belief, Defendant Peluso is a citizen of New York.

**Defendant Rogers**

88.      Defendant Rogers has served as a Company director since 2018. He also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Rogers beneficially owned 27,485 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the closing of trading on June 30, 2023 was $110.37, Defendant Rogers owned approximately $3.03 million worth of Nike Class B common stock as of that date.

89.     For the 2021 Fiscal Year, Defendant Rogers received $288,969 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $188,969 in stock awards. For the 2022 Fiscal Year, Defendant Rogers received $299,453 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $179,453 in stock awards, and $20,000 in all other compensation. For the 2023 Fiscal Year, Defendant

Rogers received $300,190 in total compensation from the Company. This included $100,00 in fees earned or paid in cash and $200,190 in stock awards.

90.    The 2023 Proxy Statement stated the following about Defendant Rogers:

Mr. Rogers is Chairman, Co-Chief Executive Officer, and Chief Investment Officer of Ariel Investments, LLC, a privately-held money management firm he founded in 1983, which serves individual and institutional investors through its mutual funds and separate accounts. Mr. Rogers is a Trustee of Ariel Investment Trust, the investment company consisting of the five mutual funds his firm manages. In 2008, Mr. Rogers was awarded Princeton University's highest honor, the Woodrow Wilson Award, presented each year to the alumnus whose career embodies a commitment to national service. Mr. Rogers served as co-chair for the Presidential Inaugural Committee 2009. Mr. Rogers is a member of the Board of Directors of The New York Times Company and Ryan Specialty Group Holdings, Inc. In addition to this public company board service, he also serves as trustee of the University of Chicago; a member of the Board of Directors of the Barack Obama Foundation, the Robert F. Kennedy Human Rights, and the National Association of Basketball Coaches (NABC) Foundation, Inc.; and a life trustee of the Chicago Symphony Orchestra. Mr. Rogers served on the Board of Directors of McDonald's Corporation from May 2003 until May 2023 and Exelon Corporation from October 2000 until April 2019.

91.    Upon information and belief, Defendant Rogers is a citizen of Illinois.

**Defendant Swan**

92.    Defendant Swan has served as a Company director since 2022. He also serves as a member of the Audit & Finance Committees According to the 2023 Proxy Statement, as of June 30, 2023, Defendant Swan beneficially owned 4,532 shares of the Company's Class B common stock. Given that the price per share of the Company's Class B common stock at the close of trading on June 30, 2023 was $110.37, Defendant Swan owned approximately $500,196.84 worth of Nike Class B common stock as of that date.

93.    For the 2023 Fiscal Year, Defendant Swan received $282,127 in total compensation from the Company. This included $73,035 in fees earned or paid in cash, $190,092 in stock awards, and $20,000 in all other compensation.

94.     The 2023 Proxy Statement stated the following about Defendant Swan:

Mr. Swan has been an Operating Partner at Andreessen Horowitz since 2021. Prior to his current role, Mr. Swan served as the Chief Executive Officer and a member of the Board of Directors of Intel Corp. ("Intel") from 2019 to 2021. Before that appointment, he was appointed to various management positions at Intel, including: Interim Chief Executive Officer and Chief Financial Officer from 2018 until 2019 and Chief Financial Officer from 2016 until 2019. Prior to joining Intel, Mr. Swan served as Operating Partner at General Atlantic LLC, a private equity firm, from 2015 to 2016. He also served as Senior Vice President, Finance and Chief Financial Officer of eBay Inc. ("eBay") from 2006 to 2015. Previously, Mr. Swan served as Chief Financial Officer of Electronic Data Systems Corporation, Chief Financial Officer of TRW Inc., as well as Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Webvan Group, Inc. Mr. Swan began his career in 1985 at General Electric, serving in numerous senior finance roles. Mr. Swan is a member of the Board of Commissioners of GoTo Group. In addition to this public company board service, he is also a member of the Board of Directors of Flexport, the American Heart Association, and Kearney. Mr. Swan served on the Board of Directors of eBay Inc. from July 2015 until June 2023 and Intel Corporation from January 2019 until February 2021.

95.     Upon information and belief, Defendant Swan is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

96.     By reason of their positions as officers, directors, and/or fiduciaries of Nike and because of their ability to control the business and corporate affairs of Nike, the Individual Defendants owed Nike and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nike in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nike and its shareholders so as to benefit all shareholders equally.

97.     Each director and officer of the Company owes to Nike and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

98.     The Individual Defendants, because of their positions of control and authority as officers and directors of Nike, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

99.     To discharge their duties, the officers and directors of Nike were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

100.    Each Individual Defendant, by virtue of their position as officers and directors, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Nike, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

101.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock

would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

102.    To discharge their duties, the officers, and directors of Nike were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nike were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Oregon, and the United States, and pursuant to Nike's own Code of Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Nike conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Nike and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nike's operations would comply with all applicable laws and Nike's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

103.    Each of the Individual Defendants further owed to Nike and the shareholders the duty of loyalty, requiring that each favor Nike's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

104.    At all times relevant hereto, the Individual Defendants were the agents of each other and Nike and were at all times acting within the course and scope of such agency.

105.    Because of their advisory, executive, managerial, and directorial positions with Nike, each of the Individual Defendants had access to adverse, non-public information about the Company.

106.    The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nike.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

107.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

Page 33 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2625489

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

108.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

109.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Nike was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

110.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

111.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nike and was at all times acting within the course and scope of such agency.

## NIKE'S CODE OF CONDUCT

112.    The Company's Code of Conduct states its purpose is to "provide[] an overview of the laws, regulations and company policies that apply to us and the work we do, but it does more than that." Additionally, the Code of Conduct requires that "our employees and Board members to comply with both the letter and spirit of the Code and make decisions that will preserve the trust that other have placed in us."

113.    Under the heading, "SPEAK UP," the Code of Conduct states the following, in relevant part: "If you see or suspect anything illegal, unethical or inappropriate, it may seem easier or safer to look the other way or let someone else take the lead."

114.    Under the heading, "WHAT HAPPENS IF WHAT I SAY STARTS AN INVESTIGATION?" the Code of Conduct states the following, in relevant part:

> Nike takes all allegations of misconduct or other wrongdoing seriously and will investigate them thoroughly. In some cases, Nike is legally required to report an investigation either internally or externally.

> The reason is simple: If processes aren't followed, or if someone begins an investigation without the authority to do so, there is a greater risk for errors that may compromise confidentiality, violate the law, damage our reputation, jeopardize Nike's investigative process or undermine a fair investigation. Having the experts evaluate allegations and determine the appropriate function to investigate helps prevent missteps and ensures a thorough and fair process.

115.    Under the heading, "CONFLICTS OF INTEREST," the Code of Conduct states the following, in relevant part:

> Nike respects the rights of its employees to partake in activities − financial, business or otherwise − outside of work, as long as that activity does not interfere with Nike′ s interests or the parameters of your employment.

Page 35 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

But conflicts with Nike must be avoided. If you use your position at Nike for personal gain, that's a conflict. And if your personal activity could compromise — or even appear to compromise —  your ability to make the best business decisions for Nike, that's a conflict.

Learning to recognize potential conflicts of interest can help you avoid one. A conflict can happen when you supervise or conduct business with someone with whom you have a close personal relationship. And it can also happen when you own, invest in or do work for a company that competes, does business or wants to do business with Nike. A conflict can even happen if you simply accept, give or offer gifts, hospitality or favors from or to parties doing business with Nike.

Potential conflicts can often be resolved with an open and honest discussion. Remember: having a conflict of interest is not necessarily a violation of our Code, but failing to disclose it is.

116.    Under the heading, "BRIBERY AND CORRUPTION," the Code of Conduct states

the following, in relevant part:

The rule is simple: Don't bribe anybody, anytime, for any reason

We do not offer, promise, give or accept money or anything of value to or from third parties to get an improper business advantage. Any of these actions constitutes a bribe.

Anti-bribery laws apply in every country where Nike does business. Criminal penalties to you and Nike for violating these laws are severe. There is no monetary threshold, so even a small or minor improper gift or donation could be construed as a bribe. Maintain accurate and transparent books and records, so all payments can be honestly described and documented.

We take particular care when working with or evaluating prospective third parties, including agents who may interact with government officials or business partners on behalf of Nike. We don't use them to do anything that is prohibited by law, our Code or Nike policies.

117.    Under the heading, "DATA PRIVACY," the Code of Conduct states the following,

in relevant part:

To deliver the best products and experiences, our consumers, employees and athletes must trust us with their personal data. It is everyone's responsibility to maintain that trust by managing personal data in appropriate and respectful ways.

We are transparent and honor individual choice. We only use data in the ways we communicated when collecting it. If we want to use it for a new purpose, we get new permission.

We collect and use only the data we need to perform our jobs, and keep it only as long as we need to. And we never use data for personal benefit.

We only share data outside the company with partners who share our commitment to managing data appropriately and lawfully.

Respecting personal data is not only the right thing to do, it is what the law requires. Unauthorized use can result in legal penalties and harm to Nike's brand reputation.

118.    Under the heading, "INSIDER TRADING," the Code of Conduct states the following:

Don't use or share nonpublic information to buy or sell stock

We share necessary and appropriate information about Nike's business with our teammates to help us get our work done. Some of this information isn't available to the public and may be what United States securities laws deem to be material: sensitive and important enough that it could influence an investment decision. To use material nonpublic information to buy or sell stock – or to pass it along to someone else so they may do so – could constitute insider trading. Insider trading not only violates our Code, it violates the law. Don't do it.

You can help to prevent insider trading by keeping Nike information tight. Don't share material nonpublic information with anyone, including family and friends. In addition, if you need to share confidential information with a third party as part of your job, make sure the party receiving the information has signed a non-disclosure agreement or is otherwise required to keep the information confidential.

Two good rules of thumb: Share sensitive Nike information with colleagues only when absolutely needed to accomplish your business objectives. And never discuss sensitive or nonpublic information in open spaces.

119.    Under the heading, "IDEAS AND INTELLECTUAL PROPERTY," the Code of Conduct states the following, in relevant part:

We protect our confidential information and respect others'

Page 37 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Nike's confidential information and intellectual property are among our most important assets. Unauthorized use can lead to serious loss of value. Pleas assume all Nike information and intellectual property is confidential unless it was made public by Nike or approved for public disclosure. These assets represent significant company investment and years of hard work by our teammates. Future products, designs, innovations, business plans – when you help protect them, you protect our competitive advantage.

We only use confidential information of other companies within the terms of a written agreement with them. In fact, you should seek advice from Legal any time you solicit, accept or use confidential information or intellectual property from those outside the company or give them access to our own.

Think twice before you post anything that could remotely be considered confidential information on social media. Similarly, avoid discussing confidential information in public places. Secure your laptop and documents that contain confidential information. Play it safe: Only discuss confidential information in appropriate places and with Nike employees who need to know.

120.    Under the heading, "BOOKS AND RECORDS," the Code of Conduct states the

following:

Make sure Nike's records are clear, accurate and complete

Financial integrity and fiscal responsibility are about more than accurate reporting of our financials, though that's certainly part of it. When we spend money on Nike's behalf, we're ultimately spending it for our shareholders. Our records, and how we maintain them, are a sign of our company's financial health.

Each of us has a responsibility to spend money appropriately, and to keep our records clear, accurate and complete. This matters in every transaction, whether you are hiring a new vendor, expensing something to Nike, signing a new business contract, preparing a financial statement or simply completing a time sheet. Our records retention policy ensures we retain the right records, in the right way, for the right periods of time.

Needless to say, you should never falsify any record or account. Be candid and transparent with management, shareholders or anyone responsible for financial reporting, forecasts or business information. To help ensure accuracy, Nike maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate.

Should you be involved in an external or internal audit, cooperate fully and provide complete, accurate and timely responses to questions and document requests. If

asked by the Ethics & Compliance Office, Global Investigations or Global Litigation to retain records, do so until you are told retention is no longer necessary.

121.    Under the heading, "OUR FUTURE," the Code of Conduct states the following, relevant part:

> Any amendment or waiver of our Code for executive officers or directors may only be granted by the Board of Directors, or a committee of the Board, and will be publicly disclosed, when required by law. Nike reserves the right to make unilateral changes to our Code or company policies at any time.

122.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. Moreover, four of the Individual Defendants violated the Insider Trading section of the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## NIKE'S AUDIT & FINANCE COMMITTEE CHARTER

123.    The Company's Audit & Finance Committee Charter (the "Audit & Finance Committee Charter") states that the purpose of the Audit & Finance Committee "is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, and internal controls of the Company."

124.    The Audit & Finance Committee Charter states its purpose further to include: "assisting the Board's oversight of: the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications and independence; and the performance of the Company's internal audit function

and independent auditor." Furthermore, it states that the purpose also includes preparing the report of the Committee that the Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement."

125. The Audit & Finance Committee Charter states its duties and responsibilities as:

1. The sole authority to retain, with shareholder ratification, and terminate the Company's independent auditor, to approve all audit engagement fees, compensation and terms, and to directly oversee the work of the independent auditor with respect to the annual audit of the Company.

2. To instruct the Company's independent auditor that it is to report directly to the Committee.

3. The sole authority to approve in advance all audit and legally permitted non-audit services to be provided by the Company's independent auditor, and audit services provided by others; provided, however, that advance approval of non-audit services by the independent auditor shall not be required if:

    1.The aggregate amount of fees for all such non-audit services provided to the Company constitutes not more than five percent of the total amount of revenues paid by the Company to its auditor during the fiscal year in which the non-audit services are provided;

    2. the services were not recognized by the Company at the time of the engagement to be non-audit services; and

    3. the services are promptly brought to the attention of the Committee and approved prior to the completion of the audit the Committee or by one or more members of the Committee who are members of the Board to whom authority to grant such approvals has been delegated by the Committee.

4. The sole authority to delegate to one or more designated members of the Committee who are independent directors of the Board, the authority to grant advance approvals of audit and non-audit services as described in Section 3 above.

5. At least annually, to obtain and review a report by the independent auditor describing: the firm's internal quality control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues; and all relationships between the independent auditor and the Company.

6. At least annually, to evaluate the independent auditor's qualifications, performance, and independence, which evaluation shall include review and evaluation of the lead partner of the independent auditor and a review of the report referred to in Section 5 above. In making its evaluation, the Committee shall take into account the opinions of management and the Company's internal auditors. The Committee shall further ensure the rotation of the lead audit and review partners every five years, or more frequently as the Committee shall determine in its sole discretion. The Committee shall decide as to whether the Company is obtaining high quality audits and whether rotation of the auditor would be helpful. The Committee shall present its conclusions with respect to the independent auditor to the Board.

7. To discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

8. To review NIKE's Annual Report to be filed with the SEC on Form 10-K, and recommend to the Board that the audited financial statements be included in the Form 10-K.

9. To discuss with the independent auditor any items required to be communicated by the independent auditor in accordance with SAS 61 and 100.

10. To discuss with the Chief Executive Officer and the Chief Financial Officer the individual certifications required to be filed with the Company's periodic reports to the SEC.

11. To discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

12. To engage and compensate independent counsel and other advisors, as the Committee determines necessary to carry out its duties.

13. To discuss policies with respect to risk assessment and risk management and to discuss the Company's major financial and other risk exposures, including risks related to information security and data protection, and the steps management has taken to monitor and control such exposures.

14. To meet periodically with the chief information officer or chief information security officer to review risks related to information security and data protection.

15. To meet separately, at least quarterly, with management, with internal auditors, and with the independent auditor.

16. To review with the independent auditor any audit problems or difficulties and

management's response, including, but not limited to, any restriction on the scope of the independent auditor's activities or on access to requested information, any significant disagreements with management, any accounting adjustments that were noted or proposed by the auditor but were passed as immaterial or otherwise, any communications between the audit team and audit firm's national office respecting auditing or accounting issues presented by the engagement, and any "management" or "internal control "letter issued, or proposed to be issued, by the independent auditor to the Company. The review shall also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

17.To resolve disagreements between management and the independent auditor regarding financial reporting.

18. To obtain from the Company's independent auditor any information required to be provided pursuant to Rule 2-07 of Regulation S-X.

19.To review and approve, if appropriate, the internal audit charter and any changes thereto.

20. To ensure that the chief internal auditor is independent of the Company's management and to concur in the selection, retention, and dismissal of the chief internal auditor.

21. To review management's assessment of the effectiveness of the Company's accounting and internal control structure and procedures.

22. To establish procedures for (i) receipt, retention, treatment, processing and resolution of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

23. To set hiring policies for employees or former employees of the independent auditor all in accordance with applicable legal requirements.

24. To meet periodically with the general counsel or other legal counsel to review legal and regulatory matters, including any matters that may have material effect on the financial statements of the Company.

25.To meet periodically with the Company's internal Clearance Director, who reviews and approves in advance all trades of NIKE common stock owned by the Company's directors and officers who are subject to Section 16 of the '34 Act.

26. To receive reports from the Company's internal Disclosure Committee, which is responsible for quarterly review of material issues regarding accounting, financial reporting, public disclosure, internal control, and fraud issues in respect

of the financial statements of the Company.

27. To report regularly to the Board any material issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

28. To direct the preparation of and approve the Audit & Finance Committee Report for inclusion in the annual Proxy Statement that summarizes the Committee's activities in compliance with Item 7of Schedule 14A under the Securities Exchange Act of 1934.

29. To direct the preparation and execution of the NYSE's annual written affirmation of director independence and qualifications to serve on the Committee as required by the NYSE Listed Company Manual.

30. To annually evaluate the performance of the Committee and report the results of the Committee performance evaluation to the Board.

31. To review and assess annually the adequacy of the Committee's charter.

32. To perform such additional activities and consider such other matters within the scope of its responsibilities as the Committee or the Board deems necessary or appropriate.

126.    In violation of the Audit & Finance Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit & Finance Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating,

misrepresenting, or omitting material facts, and properly report violations of the Audit & Finance Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

127.    Incorporated in Oregon in 1967, Nike designs, markets, and sells athletic footwear, apparel, equipment, accessories and services internationally. As one of the most well-known athletic footwear and apparel companies in the world, Nike is known for several prominent brands, including NIKE, Jordan, and Converse.

128.    The Company's NIKE brand products are sold through Nike Digital, retail stores, wholesale partners, distributors and licensees. In addition to selling apparel, athletic equipment, and shoes through the Company's website Nike.com, Nike Digital also features digital platforms that include fitness and activity apps, sport, fitness and wellness content, and digital services and features to improve customer experiences in Nike retail stores.

129.    In the past, the Company stressed that three "competitive advantages" provided the foundation for Nike's success. These "advantages" included: "a culture deeply rooted in innovation, a brand that deeply connects with consumers fueled by compelling storytelling and an unmatched sports marketing portfolio."

130.    In 2017, the Company created and implemented the "Consumer Direct Offense Strategy" to help increase direct connections and innovation with consumers. This strategy emphasized using Nike's digital platforms and presence as a way of directly connecting with consumers by "add[ing] greater digital expertise and control in the markets where consumer connections happen." This strategy shift led Nike to report financial results from Nike Digital and Nike's retail stores as "Nike Direct." Nike Direct features four geographic operating areas: North America; EMEA; Greater China; and Asia Pacific & Latin America.

131.    On June 25, 2020, the Individual Defendants announced a second phase to Nike's Consumer Direct Offense Strategy called "Consumer Direct Acceleration," which was deemed Nike's "new digitally empowered phase of our consumer direct strategy" meant to give consumers a "consistent, seamless physical and digital experience."

132.    As the Company accelerated this direct-to-consumer strategy, Nike began dropping its sales partners, and by late 2020, had dropped approximately one-third of its sale partners, while also materially decreasing sales to other major retail clients—including Foot Locker, DSW, and Macy's—to further move Nike's operations to direct-to-consumer sales. Indeed, Nike attempted to focus on, among other things, "data and analytics, demand sensing, insight gathering," and inventory management, to quicken Nike's "digital transformation."

133.    Throughout the Relevant Period, the Individual Defendants represented that Nike's business model, specifically, the direct-to-consumer and Nike Direct facets of the business model, positioned the Company for long-term growth, while simultaneously dismissing the impact of the significant competition from other businesses that Nike faced and continues to face today.

134.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

135.    Also, during the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Nike to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between April 1, 2021, and February 29, 2024, approximately *106,889,217 shares* of Nike's common stock was repurchased, costing the Company over *$8.75 billion*. As the Company's stock was actually only worth $75.37 per share, the price at which it was trading when markets closed on June 28, 2024, the Company overpaid for repurchases of its own stock by *over $3.5 billion* in total.

136.    In further breach of their fiduciary duties, Defendants Friend, Henry, and Parker engaged in extremely lucrative insider trading while the Company's Class B common stock was trading at artificially inflated prices as a result of the Individual Defendants causing the Company to issue materially false and misleading statements, reaping aggregate personal profits exceeding *$211,339,280*.

**Materially False and Misleading Statements**

*March 19, 2021 Press Release*

137.    On March 19, 2021, after the market closed, the Company released its financial outcomes for the third quarter of the 2021 Fiscal Year. The press release emphasized a 3% increase in quarterly revenues from the previous fiscal year, which was "led by Greater China reported revenue growth of 51 percent" and "NIKE Brand digital sales increased by 59 percent . . . with strong double-digit increases in all geographies." Additionally, Defendant Donahoe in this press release emphasized the Company's "strong competitive advantages" as the reason for Nike's consistent success. Likewise, Defendant Friend stated "NIKE's brand momentum is as strong as ever, and we are driving focused growth against our largest opportunities."

*March 19, 2021 Earnings Call*

138.    On the same day, after the market closed, the Company held an earnings conference call with investors and analysts discuss Nike's financial outcomes for the third quarter of the 2021 Fiscal Year. During the call, Defendant Donahoe highlighted Nike's "tremendous success in digital," which included Nike's "digital transformation" as its "unique advantage" to power its international brand.

*June 24, 2021 Press Release*

139.    On June 24, 2021, after the market closed, the Company released its financial outcomes for the fourth quarter and the full 2021 Fiscal Year. Defendant Donahoe stressed in this press release that "NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world." The Individual Defendants highlighted the importance of the Company's digital existence, with Defendant Friend stating "NIKE's brand momentum is a testament to our authentic consumer connections, digital strength and continued operation execution," and "[a]s we advance our consumer-led digital transformation, we are building a new financial model that will continue to fuel long-term sustainable, profitable growth for NIKE."

*June 24, 2021 Earnings Call*

140.    On the same day, after the market closed, the Company held an earnings conference call with investors and analysts where Defendant Donahoe stated that the Company's "strong business results proved yet again NIKE's unique competitive advantage." Additionally, he flaunted that "we are better positioned to drive sustainable long-term growth than we were before the pandemic" and "[o]ur relentless pipeline of innovative products continues to create separation between us and our competition."

141.    Furthermore, on the same call, Defendant Friend explained Nike's Consumer Direct Acceleration Strategy, stating Nike will make an "accelerated shift to a more direct member-centric business model" where the revenue "[g]rowth will be led by NIKE Direct and our strategic marketplace partners." Particularly, he stated that the Individual Defendants aim for NIKE Direct "to represent approximately 60% of the business in fiscal '25, led by growth in digital."

### August 9, 2021 Proxy Statement

142.    On August 9, 2021, Nike filed a proxy statement on Schedule 14A, pursuant to Section 14(a) of the Exchange Act (the "2021 Proxy Statement") with the SEC. Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers solicited the 2021 Proxy Statement which contained material misstatements and omissions.

143.    The 2021 Proxy Statement called for shareholders to vote in favor of seven proposals, including, *inter alia*, the re-election of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers to the Board, the approval, on a non-binding advisory basis, of certain executive compensation, and the ratification of the appointment of PricewaterhouseCoopers LLP ("PWC") as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

144.    Regarding the Company's "Risk Oversight," the 2021 Proxy Statement stated the following as to risk management, in relevant part:

> While the Company's management team is responsible for day-to-day management of the various risks facing the Company, the Board takes an active role in the oversight of the management of critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of NIKE's business strategy. The Board recognizes it is neither possible nor prudent to eliminate all risk. Purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its strategic objectives.

145.    Regarding the Company's Code of Conduct, the 2021 Proxy Statement stated the following, in relevant part:

> The NIKE Code of Conduct is available at the Company's corporate website, http://investors.nike.com, and will be provided in print without charge to any shareholder who submits a request in writing to NIKE Investor Relations, One Bowerman Drive, Beaverton, Oregon 97005-6453. The Code of Conduct applies to all of the Company's employees and directors, including our CEO and all other executive officers. The Code of Conduct provides that any waiver of the Code of Conduct for executive officers or directors may be made only by the Board or a committee of the Board. Any such waiver will be publicly disclosed, when required by law. The Company plans to disclose amendments to, and waivers from, the Code of Conduct on the Company's corporate website: http://investors.nike.com.

146.    Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers caused the 2021 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

147.    The 2021 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

148.    As a result of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers causing the 2021 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint PWC as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

### December 20, 2021 Earnings Call

149.    On December 20, 2021, after the market closed, the Company released its financial outcomes for the second quarter of the 2022 Fiscal Year and held an earnings conference call with investors and analysts. On this call, Defendant Donahoe touted that "[t]he results we delivered offered continued proof that our strategy is working." Additionally, he stressed that the Company's digital presence as its "fourth emerging competitive advantage . . . as we are one of the few brands that can directly connect with and serve consumers at scale."

150.    Furthermore, on the same call, Defendant Donahoe stressed the Company's competitive position while addressing a J.PMorgan Chase & Co. analyst by stating " digital penetration is at an all-time high," leading to a "direct connection with consumer" that is in the long run "strengthening and strengthening [NIKE's brand against our historical competitors."

### March 21, 2022 Earnings Call

151.    On March 21, 2022, after the market closed, the Company released its financial outcomes for the third quarter of the 2022 Fiscal Year and held an earnings call with investors. On this call, Defendant Donahoe emphasized the Company's "growing digital advantage," specifically as the Individual Defendants "continue to drive greater competitive separation" through Nike Digital. Furthermore, even though the Company's Greater China revenues for this

quarter declined by 8% compared to the previous fiscal year, Defendant Friend reiterated to analysts and investors that "NIKE was rated the #1 cool and #1 favorite brand in China, creating separation and distinction versus the competition."

152.   The statements referenced in ¶¶ 137-141 and 149-151 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

#### June 27, 2022 Press Release

153.   The truth began to emerge on June 27, 2022, after the market closed, when the Company released its financial outcomes for the fourth quarter and full 2022 Fiscal Year. The press release indicated quarterly revenues were down by 1% from the previous fiscal year and that quarterly wholesale revenues were also down by 7% from the previous fiscal year. Additionally, the Company's quarterly gross margin fell by 80 basis points from the previous fiscal year, "primarily due to higher inventory obsolescence reserves in Greater China and elevated freight and logistics costs," and the Company's 2022 gross margin increase of 120 basis points year-over-year was significantly lower than expected.

154.   Additionally, Defendant Donahoe claimed in the press release that even though the Company's performance was sub-par, Nike's "competitive advantages, including our pipeline of

innovative product and expanding digital leadership, prove that our strategy is working as we create value through our relentless drive to serve the future of sport."

### June 27, 2022 Earnings Call

155.    On the same day, after the market closed, the Company held an earnings conference call with investors and analysts, during which Defendant Donahoe reassured investors that "as we look ahead to fiscal '23, we remain very confident in our long-term strategy and our growth outlook." Additionally, in response to an analyst's question regarding the Individual Defendants' China outlook, Defendant Donahoe downplayed concerns, especially about an expected 100+ basis point decline in the first quarter of the 2023 Fiscal Year gross margin, by stating that "[w]e've always taken a long-term view" in China and that NIKE is China's "#1 cool brand."

156.    On this news, the price of Nike's Class B common stock fell $7.72 per share, or approximately 7%, from a closing price of $110.50 per share on June 27, 2022, to close at $102.78 per share on June 28, 2022.

### July 21, 2022 Proxy Statement

157.    On July 21, 2022, Nike filed a proxy statement on Schedule 14A, pursuant to Section 14(a) of the Exchange Act (the "2022 Proxy Statement") with the SEC. Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers solicited the 2022 Proxy Statement.

158.    The 2022 Proxy Statement called for shareholders to vote in favor of six proposals, including, *inter alia*, (1) the re-election of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers to the Board, (2) the approval, on a non-binding advisory basis, of certain executive compensation, (3) the ratification of the appointment of PWC as the

Company's independent registered public accounting firm for the 2023 Fiscal Year, and (4) the approval of an amendment to Nike's Employee Stock Purchase Plan to increase the number of authorized shares available under the plan.

159.    Regarding the Company's "Risk Oversight," the 2022 Proxy Statement stated the following as to risk management, in relevant part:

> While the Company's management team is responsible for day-to-day management of the various risks facing the Company, the Board takes an active role in the oversight of the management of critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of NIKE's business strategy. The Board recognizes it is neither possible nor prudent to eliminate all risk. Purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its strategic objectives.

160.    Regarding the Company's Code of Conduct, the 2022 Proxy Statement stated the following, in relevant part:

> The NIKE Code of Conduct is available at the Company's corporate website, http://investors.nike.com, and will be provided in print without charge to any shareholder who submits a request in writing to NIKE Investor Relations, One Bowerman Drive, Beaverton, Oregon 97005-6453. The Code of Conduct applies to all of the Company's employees and directors, including our CEO and all other executive officers. The Code of Conduct provides that any waiver of the Code of Conduct for executive officers or directors may be made only by the Board or a committee of the Board. Any such waiver will be publicly disclosed, when required by law. The Company plans to disclose amendments to, and waivers from, the Code of Conduct on the Company's corporate website: http://investors.nike.com.

161.    Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times

162.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

163.    As a result of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers causing the 2022 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso and Rogers to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint PWC as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

### *September 29, 2022 Press Release*

164.    The truth continued to emerge on September 29, 2022, after the market closed, when the Company released its financial outcomes for the first quarter of the 2023 Fiscal Year. The press release revealed disappointing results, which included a 22% decline in new income, a 20% diluted EPS, and a gross margin of 220 basis points. There was only a slight increase reported of 4% for the Company's quarterly revenue. Additionally, the press release revealed the reasoning for the low gross margin number was primarily due to the disposal of excess inventory, which was 44% higher than the previous fiscal year. Defendant Friend also stated the reasoning for the margin issues was because "we've decided to take that inventory and more aggressively liquidate it."

*September 29, 2022 Earnings Call*

165.    On that same day, after the market closed, the Company held an earnings conference call with investors and analysts to discuss the Company's disappointing results for the first quarter of the 2023 Fiscal Year. During the call, Defendant Donahoe claimed that the industry was facing a "period of turbulence," and the Individual Defendants "want to leverage our strengths to emerge in a stronger position than our competition at the other end of it." Particularly, Defendant Donahoe accentuated that "[w]e've got a really strong innovation pipeline. So we talk about the transitional and the structural. The transitional is navigating through the inventory situation. The structural is leveraging our competitive advantages so we emerge in a stronger position, and we'll be playing offense on both."

166.    On this news, the price of Nike's Class B common stock fell $12.21 per share, or approximately 13%, from a closing price of $95.33 per share on September 29, 2022, to close at $83.12 per share on September 30, 2023.

*December 20, 2022 Press Release*

167.    On December 20, 2022, after the market closed, the Company released its financial outcomes for the second quarter of the 2023 Fiscal Year. The press release continued to emphasize the Company's growth strategy, with Defendant Donahoe asserting that "NIKE's results this quarter are a testament to our deep connection with consumers," "[o]ur growth was broad-based and was driver by our expanding digital leadership and brand strength," and that "[t]hese results give us confidence in delivering the year as our competitive advantages continue to fuel our momentum."

168.    Moreover, Defendant Friend claimed that "[c]onsumer demand for NIKE's portfolio of brands continues to drive strong business momentum in a dynamic environment" and

that Defendants are "on track to deliver on our operational and financial goals – setting the foundation for sustainable, profitable growth."

### December 20, 2022 Earnings Call

169.    On the same day, after the market closed, the Company held an earnings conference call with investors and analysts to discuss the Company's financial outcomes for the second quarter of the 2023 Fiscal Year. During the call, Defendant Donahoe stressed that the Company is "creating more separation between us and our competition thanks to the meaningful relationships we have with consumers and the continued success of our strategy."

### June 29, 2023 Earnings Call

170.    On June 29, 2023, after the market closed, the Company released its financial outcomes for the fourth quarter and full 2023 Fiscal Year and held an earnings conference call with investors and analysts to discuss the same. During the call, Defendant Friend declared the Company's 2024 Fiscal Year outlook for revenue to be in the mid-single digits and a growth margin growth in the middle of 140 to 160 basis points. These numbers forecasted were partly due to "clear advantages, strong consumer momentum, a robust product innovation pipeline, healthy inventory and a normalized flow of supply."

171.    Furthermore, during the call, a J.P Morgan Chase & Co. analyst asked Defendant Donahoe to describe "how you believe the NIKE brand is positioned to capture market share globally?" Defendant Donahoe responded to this inquiry by stating "leverage our competitive advantages" for example, Nike's digital presence, "to not only gain share but also grow the market."

### July 20, 2023 Proxy Statement

172.    On July 20, 2023, Nike filed the 2023 Proxy Statement with the SEC. Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

173.    The 2023 Proxy Statement called for shareholders to vote in favor of six proposals, including, *inter alia*, (1) the re-election of Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan to the Board, (2) the approval, on a non-binding advisory basis, of certain executive compensation, (3) the holding of an advisory vote on the frequency of advisory votes on executive compensation, and (4) the ratification of the appointment of PWC as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

174.    Regarding the Company's "Risk Oversight," the 2023 Proxy Statement stated the following as to risk management, in relevant part:

> While the Company's management team is responsible for day-to-day management of the various risks facing the Company, the Board takes an active role in the oversight of the management of critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of NIKE's business strategy. The Board recognizes it is neither possible nor prudent to eliminate all risk. Purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its strategic objectives.

175.    Regarding the Company's Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

> The NIKE Code of Conduct is available at the Company's corporate website, http://investors.nike.com, and will be provided in print without charge to any shareholder who submits a request in writing to NIKE Investor Relations, One Bowerman Drive, Beaverton, Oregon 97005-6453. The Code of Conduct applies to all of the Company's employees and directors, including our CEO and all other executive officers. The Code of Conduct provides that any waiver of the Code of Conduct for executive officers or directors may be made only by the Board or a committee of the Board. Any such waiver will be publicly disclosed, when required by law. The Company plans to disclose amendments to, and waivers from, the Code of Conduct on the Company's corporate website: http://investors.nike.com.

176.     Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

177.     The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

178.     As a result of Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, and Swan causing the 2023 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint PWC as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

179.     The statements referenced in ¶¶ 154-155, 165, and 167-171 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the

2625489

Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Fully Emerges**

### *December 21, 2023 Press Release*

180.    The truth continued to emerge on December 21, 2023, after the market closed, when the Company released its financial outcomes for the second quarter of the 2024 Fiscal Year. The press release stated that the Company's total revenue growth was 1%, year-over-year, largely weighed down by low quarterly revenues in North America and EMEA.

### *December 21, 2023 Earnings Call*

181.    On the same day, after the market closed, the Company held an earnings conference call with investors and analysts to discuss the Company's financial outcomes for the second quarter of the 2024 Fiscal Year. During the call, Defendant Friend disclosed that the Company's "[t]otal retail sales across the marketplace fell short of our expectations" and Nike Digital consumer traffic declined to competitors due to "higher levels of promotional activity across the marketplace." For these reasons, Defendant Friend revealed that the Company was "adjusting [its] channel growth plans for the remainder of the year" and "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings over the next 3 years," this would encompass refining the Company's supply chain efficiency and "streamlining [its] organization structure."

182.    On this news, the price of Nike's Class B common stock fell $14.49 per share, or approximately 12%, from a closing price of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

### March 21, 2024 Press Release

183.    The truth continued to emerge on March 21, 2024, after the market closed, when the Company released its financial outcomes for the third quarter of the 2024 Fiscal Year.  The press release disclosed that there were 3% declines in both EMEA and NIKE Digital revenue from the previous fiscal year and approximately 0.4% Nike Direct revenue growth from the previous fiscal year.

### March 21, 2024 Earnings Call

184.    On the same day, after the market closed, the Company held an earnings conference with investors and analysts to discuss the Company's financial outcomes for the third quarter of the 2024 Fiscal Year. During the call, Defendant Donahoe stated "NIKE is not performing in our potential." He then revealed that, "while NIKE Direct will continue to play a critical role, we must lean in with our wholesale partners to elevate our brand and grow the total marketplace." Additionally, he added that "we're combining both the best of our direct offense but a reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the path of our consumer." Defendant Friend, on the same call, notified investors that "we are prudently planning for revenue in the first half of the fiscal year [2025] to be down low single digits."

185.    On this news, the price of Nike's Class B common stock fell $6.96 per share, or approximately 7%, from a closing price of $100.82 per share on March 21, 2024, to close at $93.86 per share on March 22, 2024.

### *June 27, 2024 Press Release*

186.     Finally, on June 27, 2024, the truth fully emerged, after the market closed, when the Company released its financial results for the fourth quarter and full 2024 Fiscal Year. The press release disclosed that there were declines by 2% year-over-year in fourth quarter revenues, 8% year-over-year in Nike Direct quarterly revenues, and 10% year-over-year in Nike Digital quarterly revenues. Additionally, the press release revealed only a small full year revenue growth of approximately 0.3% for the Company for the 2024 Fiscal Year and an insubstantial year-over-year growth of approximately 1% in Nike Direct revenue for the full 2024 Fiscal Year. Despite these meager revenue increases, Nike Digital's full 2024 Fiscal Year revenue actually declined by 3% year-over-year.

### *June 27, 2024 Earnings Call*

187.     The accompanying earnings conference call discussing the financial results for the fourth quarter and full 2024 Fiscal Year, held after market hours with investors and analysts that same day, further revealed the truth. During the earnings call, Defendant Donahoe claimed that "fiscal '25 will be a transition year for our business," yet "highlighted the strategic shifts we're taking as a company, including leadership and organization changes" and "making a series of adjustments to position us to compete and win."

188.     Shockingly, on this same call, Defendant Friend disclosed a "more pronounced impact" from negative factors expected to affect the Company in the next fiscal year. Taking into consideration these negative factors, Defendant Friend revealed that the Company's 2025 revenue is anticipated "to be down mid-single digits with the first half down high single digits"— materially worse than what was previously disclosed. When questioned about the significant change in the Company's financial predictions from the previous quarter, Defendant Friend

described there was a "more pronounced" decline in the Company's lifestyle product on Nike Digital platforms than anticipated. He continued, by revealing, that as a way to "manage the health of [NIKE'S largest franchises]," the Individual Defendants are preparing to "reduc[e] what we're offering to consumers through our digital channel."

189.     Analysts were shocked and disappointed by the Company's fourth quarter and full 2024 Fiscal Year financial outcomes. Specifically, analysts from Barclays were convinced "[NIKE]'s strategy continues to increase in uncertainty" as to the Company's "large-scale efforts to reset the business," counting Nike's "redirection back into the wholesale channel." Primarily, the analysts from Barclays stated that "[w]e believe the most recent quarterly results have raised more questions and more uncertainty about the long-term health of the Nike brand." Furthermore, an analyst from Stifel expressed that "[m]anagement['s] credibility is severely challenged, and [the] potential for C-level regime change adds further uncertainty." Reiterating this same opinion of management, Niel Saunders, managing director of GlobalData, stated that Nike's "[m]anagement has tried to sell a story of improvement to investors, but is not prepared to back it up with positive forecasts."

190.     On this news, the price of Nike's Class B common stock fell $18.82 per share, or approximately 20%, from a closing price of $94.19 per share on June 27, 2024, to close at $75.37 per share on June 28, 2024. This was the Company's largest decline since 2001.

## REPURCHASES DURING THE RELEVANT PERIOD

191.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its Class B common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $8.75 billion*** to repurchase approximately

106,889,217 shares of its own common stock at artificially inflated prices from April 2021 through February 2024.

192.    According to the Form 10-K the Company filed with the SEC on July 20, 2021 (the "2021 Form 10-K"), between April 1, 2021, and April 30, 2021, the Company purchased 1,658,744 shares of its Class B common stock for approximately $216,996,890.08 at an average price of $130.82 per share.

193.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $91,977,354.80 for repurchases of its own stock between April 1, 2021, and April 30, 2021.

194.    According to the 2021 Form 10-K, between May 1, 2021, and May 31, 2021, the Company purchased 3,208,713 shares of its common stock for approximately $432,983,732.22 at an average price of $134.94 per share.

195.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $191,143,033.41 for repurchases of its own stock between May 1, 2021, and May 31, 2021.

196.    According to the Form 10-Q the Company filed with the SEC on October 5, 2021 (the "2022 1Q 10-Q"), between June 1, 2021, and June 30, 2021, the Company purchased 1,718,111 shares of its common stock for approximately $231,704,449.46 at an average price of $134.86 per share.

197.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $102,210,423.39 for repurchases of its own stock between June 1, 2021, and June 30, 2021.

198.    According to the 2022 1Q 10-Q, between July 1, 2021, and July 31, 2021, the Company purchased 1,147,984 shares of its common stock for approximately $185,594,573.28 at an average price of $161.67 per share.

199.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $99,071,019.20 for repurchases of its own stock between July 1, 2021, and July 31, 2021.

200.    According to the 2022 1Q 10-Q, between August 1, 2021, and August 31, 2021, the Company purchased 1,913,578 shares of its common stock for approximately $325,002,087.52 at an average price of $169.84 per share.

201.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $180,775,713.66 for repurchases of its own stock between August 1, 2021, and August 31, 2021.

202.    According to the Form 10-Q the Company filed with the SEC on January 6, 2022 (the "2022 2Q 10-Q"), between September 1, 2021, and September 30, 2021, the Company purchased 2,145,173 shares of its common stock for approximately $336,320,222.94 at an average price of $156.78 per share.

203.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $174,638,533.93 for repurchases of its own stock between September 1, 2021, and September 30, 2021.

204.    According to the 2022 2Q 10-Q, between October 1, 2021, and October 31, 2021, the Company purchased 2,054,002 shares of its common stock for approximately $320,835,112.40 at an average price of $156.20 per share.

205.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $166,024,981.66 for repurchases of its own stock between October 1, 2021, and October 31, 2021.

206.    According to the 2022 2Q 10-Q, between November 1, 2021, and November 30, 2021, the Company purchased 1,814,713 shares of its common stock for approximately $310,787,748.38 at an average price of $171.26 per share.

207.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $174,012,829.57 for repurchases of its own stock between November 1, 2021, and November 30, 2021.

208.    According to the Form 10-Q the Company filed with the SEC on April 5, 2022 (the "2022 3Q 10-Q"), between December 1, 2021, and December 31, 2021, the Company purchased 2,016,185 shares of its common stock for approximately $336,702,895 at an average price of $167.00 per share.

209.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $184,743,031.55 for repurchases of its own stock between December 1, 2021, and December 31, 2021.

210.    According to the 2022 3Q 10-Q, between January 1, 2022, and January 31, 2022, the Company purchased 2,619,600 shares of its common stock for approximately $391,368,240 at an average price of $149.40 per share.

211.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $193,928,988 for repurchases of its own stock between January 1, 2022, and January 31, 2022.

212.    According to the 2022 3Q 10-Q, between February 1, 2022, and February 28, 2022, the Company purchased 3,455,583 shares of its common stock for approximately $494,148,369 at an average price of $143.00 per share.

213.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $233,701,078.29 for repurchases of its own stock between February 1, 2022, and February 28, 2022.

214.    According to the Form 10-K the Company filed with the SEC on July 21, 2022 (the "2022 10-K"), between March 1, 2022, and March 31, 2022, the Company purchased 3,729,125 shares of its common stock for approximately $483,891,260 at an average price of $129.76 per share.

215.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $202,827,108.75 for repurchases of its own stock between March 1, 2022, and March 31, 2022.

216.    According to the 2022 10-K, between April 1, 2022, and April 30, 2022, the Company purchased 2,645,732 shares of its common stock for approximately $343,548,300.20 at an average price of $129.85 per share.

217.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $144,139,479.36 for repurchases of its own stock between April 1, 2022, and April 30, 2022.

218.    According to the 2022 10-K, between May 1, 2022, and May 31, 2022, the Company purchased 2,078,150 shares of its common stock for approximately $234,290,631 at an average price of $112.74 per share.

219.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $77,660,465.50 for repurchases of its own stock between May 1, 2022, and May 31, 2022.

220.    According to the Form 10-Q the Company filed with the SEC on October 6, 2022 (the "2023 1Q 10-Q"), between June 1, 2022, and June 30, 2022, the Company purchased 2,947,270 shares of its common stock for approximately $330,772,112.10 at an average price of $112.23 per share.

221.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $108,636,372.20 for repurchases of its own stock between June 1, 2022, and June 30, 2022.

222.    According to the 2023 1Q 10-Q, between July 1, 2022, and July 31, 2022, the Company purchased 2,961,287 shares of its common stock for approximately $315,998,935.77 at an average price of $106.71 per share.

223.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $92,806,734.58 for repurchases of its own stock between July 1, 2022, and July 31, 2022.

224.    According to the 2023 1Q 10-Q, between August 1, 2022, and August 31, 2022, the Company purchased 3,053,679 shares of its common stock for approximately $344,302,307.25 at an average price of $112.75 per share.

225.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $114,146,521.02 for repurchases of its own stock between August 1, 2022, and August 31, 2022.

226.    According to the Form 10-Q the Company filed with the SEC on January 5, 2023 (the "2023 2Q 10-Q"), between September 1, 2022, and September 30, 2022, the Company purchased 3,280,909 shares of its common stock for approximately $335,505,754.34 at an average price of $102.26 per share.

227.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $88,223,643.01 for repurchases of its own stock between September 1, 2022, and September 30, 2022.

228.    According to the 2023 2Q 10-Q, between November 1, 2022, and November 30, 2022, the Company purchased 7,631,068 shares of its common stock for approximately $768,066,994.20 at an average price of $100.65 per share.

229.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $192,913,399.04 for repurchases of its own stock between November 1, 2022, and November 30, 2022.

230.    According to the Form 10-Q the Company filed with the SEC on April 6, 2023 (the "2023 3Q 10-Q"), between December 1, 2022, and December 31, 2022, the Company purchased 6,993,677 shares of its common stock for approximately $778,186,439.79 at an average price of $111.27 per share.

231.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $251,073,004.30 for repurchases of its own stock between December 1, 2022, and December 31, 2022.

232.    According to the 2023 3Q 10-Q, between January 1, 2022, and January 31, 2022, the Company purchased 3,040,909 shares of its common stock for approximately $382,090,215.85 at an average price of $125.65 per share.

233.    As the Company's stock was actually only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $152,896,904.52 for repurchases of its own stock between January 1, 2022, and January 31, 2022.

234.    According to the 2023 3Q 10-Q, between February 1, 2022, and February 28, 2022, the Company purchased 2,902,915 shares of its common stock for approximately $358,510,002.50 at an average price of $123.50 per share.

235.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $139,717,298.95 for repurchases of its own stock between February 1, 2022, and February 28, 2022.

236.    According to the Form 10-K the Company filed with the SEC on July 20, 2023 (the "2023 10-K"), between March 1, 2023, and March 31, 2023, the Company purchased 4,118,427 shares of its common stock for approximately $494,375,977.08 at an average price of $120.04 per share.

237.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $183,970,134.09 for repurchases of its own stock between March 1, 2023, and March 31, 2023.

238.    According to the 2023 10-K, between April 1, 2023, and April 30, 2023, the Company purchased 3,282,288 shares of its common stock for approximately $410,318,822.88 at an average price of $125.01 per share.

239.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $162,932,776.32 for repurchases of its own stock between April 1, 2023, and April 30, 2023.

240.    According to the 2023 10-K, between May 1, 2023, and May 31, 2023, the Company purchased 4,134,824 shares of its common stock for approximately $489,149,679.20 at an average price of $118.30 per share.

241.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $177,507,994.32 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

242.    According to the Form 10-Q the Company filed with the SEC on October 6, 2023 (the "2024 1Q 10-Q"), between June 1, 2023, and June 30, 2023, the Company purchased 3,391,842 shares of its common stock for approximately $373,543,559.46 at an average price of $110.13 per share.

243.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $117,900,427.92 for repurchases of its own stock between June 1, 2023, and June 30, 2023.

244.    According to the 2024 1Q 10-Q, between July 1, 2023, and July 31, 2023, the Company purchased 3,236,889 shares of its common stock for approximately $352,141,154.31 at an average price of $108.79 per share.

245.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $108,176,830.38 for repurchases of its own stock between July 1, 2023, and July 31, 2023.

246.    According to the 2024 1Q 10-Q, between August 1, 2023, and August 31, 2023, the Company purchased 3,838,777 shares of its common stock for approximately $406,027,443.29 at an average price of $105.77 per share.

247.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $116,698,820.80 for repurchases of its own stock between August 1, 2023, and August 31, 2023.

248.    According to the Form 10-Q the Company filed with the SEC on January 5, 2024 (the "2024 2Q 10-Q"), between September 1, 2023, and September 30, 2023, the Company purchased 4,042,731 shares of its common stock for approximately $386,161,665.12 at an average price of $95.52 per share.

249.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $81,461,029.65 for repurchases of its own stock between September 1, 2023, and September 30, 2023.

250.    According to the 2024 2Q 10-Q, between October 1, 2023, and October 31, 2023, the Company purchased 4,179,244 shares of its common stock for approximately $421,226,002.76 at an average price of $100.79 per share.

251.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $106,236,382.48 for repurchases of its own stock between October 1, 2023, and October 31, 2023.

252.    According to the 2024 2Q 10-Q, between November 1, 2023, and November 31, 2023, the Company purchased 3,724,655 shares of its common stock for approximately $401,629,548.65 at an average price of $107.83 per share.

253.    As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $120,902,301.30 for repurchases of its own stock between November 1, 2023, and November 31, 2023.

254.     According to the Form 10-Q the Company filed with the SEC on April 4, 2024 (the "2024 3Q 10-Q"), between December 1, 2023, and December 31, 2023, the Company purchased 3,355,605 shares of its common stock for approximately $390,995,094.60 at an average price of $116.52 per share.

255.     As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $138,083,145.75 for repurchases of its own stock between December 1, 2023, and December 31, 2023.

256.     According to the 2024 3Q 10-Q, between January 1, 2024, and January 31, 2024, the Company purchased 3,119,852 shares of its common stock for approximately $323,778,240.56 at an average price of $103.78 per share.

257.     As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $88,634,995.32 for repurchases of its own stock between January 1, 2024, and January 31, 2024.

258.     According to the 2024 3Q 10-Q, between February 1, 2024, and February 28, 2024, the Company purchased 1,446,976 shares of its common stock for approximately $135,813,167.36 at an average price of $104.31 per share.

259.     As the Company's stock was only worth $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $41,875,485.44 for repurchases of its own stock between February 1, 2024, and February 31, 2024.

260.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by **over $3.5 billion.**

## DAMAGES TO NIKE

261.     As a direct and proximate result of the Individual Defendants' conduct, Nike has lost and expended, and will continue to lose and expend, many millions of dollars.

2625489

262.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

263.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

264.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

265.    Such losses include the Company's overpayment of more than $3.5 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

266.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the three Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $211,339,280 during the Relevant Period.

267.    As a direct and proximate result of the Individual Defendants' conduct, Nike has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

268.    Plaintiff brings this action derivatively and for the benefit of Nike to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as officers and directors of Nike, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a), 10(b), and 20(a) of the Exchange Act, as well as aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

269.    Nike is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

270.    Plaintiff is, and has been at all relevant times, a shareholder of Nike. Plaintiff will adequately and fairly represent the interests of Nike in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

271.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as though fully set forth herein.

272.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Defendants Donahoe, Benko, Cook, Duckett, Gil, Henry, Knight, Parker, Peluso, Rogers, and Swan (the "Director-Defendants"), along with nonparty Maria Henry (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six Directors who were on the Board at the time this action commenced.

273.    Demand is excused as to all the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

274.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Nike to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Nike's financial well-being and prospects from the investing public and supporting the artificially inflated price of Nike's securities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. In addition, Director-Defendants solicited the 2021, 2022 and 2023 Proxy Statements, all of which contained material misrepresentations and omissions that led to the re-election of the Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. As a result of the foregoing, demand would be futile, and thus excused, as to all of the Director-Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

275.    Additional reasons that demand as to Defendant Donahoe is futile follow. Defendant Donahoe has served as the Company's CEO and President since January 2020 and as a Company director since 2014. He also serves as a member of the Executive Committee. Defendant Donahoe solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Duckett, Graf, Henry,

Knight, Parker, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Donahoe solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Donahoe has received and continues to receive handsome compensation for this role as a director described above. As the trusted President and CEO, Defendant Donahoe conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. For these reasons, Defendant Donahoe faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

276.    Additional reasons that demand as to Defendant Benko is futile follow. Defendant Benko has served as a Company director since 2018. She also serves as a member of the Compensation Committee. Defendant Benko solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Donahoe, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso, Rogers, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Benko solicited the 2023 Proxy Statement, which contained false and misleading

statements and contributed to the re-election of Defendants Donahoe, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, Swan, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Benko has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, Defendant Benko conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Benko faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

277.    Additional reasons that demand on Defendant Cook is futile follow. Defendant Cook is the Lead Independent Director of the Board and has served as a director of the Company since 2005. He also serves as the Chair of the Compensation Committee. Defendant Cook solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Donahoe, Duckett, Graf, Henry, Knight, Parker, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Cook solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Donahoe, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Cook has received and continues to receive handsome compensation for his role as a

director as described above. As the trusted Lead Independent Director of the Board, Defendant Cook conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Cook faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

278.    Additional reasons that demand as to Defendant Duckett is futile follow. Defendant Duckett has served as a Company director since 2019. She also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. Defendant Duckett solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Donahoe, Benko, Cook, Graf, Henry, Knight, Parker, Peluso, Rogers, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Duckett solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Donahoe, Benko, Cook, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, Swan, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Duckett has received and continues to receive handsome compensation for her role as a director described above. As a trusted Company director, Defendant Duckett conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Duckett faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

279.   Additional reasons that demand as to Defendant Gil is futile follow. Defendant Gil has served as a Company director since 2022. She also serves as a member of the Compensation Committee. Defendant Gil solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso, Rogers, Swan, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Gil has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, Defendant Gil conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Gil faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

280.   Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry has served as a Company director since 2018. He also serves as a member of the Audit &

Finance Committee. Defendant Henry solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Graf, Knight, Parker, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Henry solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Knight, Parker, Peluso, Rogers, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Henry received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, Defendant Henry conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading, obtaining personal profits of approximately $730,522 for trading personal holdings of Nike Class B common stock while the stock was trading at artificially inflated prices because of the Individual Defendants causing the Company to issue false and misleading statements. For these reasons, Defendant Henry faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

281.    Additional reasons that demand on Defendant Knight is futile follow. Defendant Knight is the son of the co-founder of the Company and Chairman Emeritus of the Board, Philip Knight. He has served as a Company director since 2015 and also serves as a member of the

Executive Committee. Additionally, Defendant Knight is a director of the entity Swoosh, LLC, which is the primary shareholder of the Company's Class A common stock.  He also is a beneficiary of the Travis A. Knight 2009 Irrevocable Trust II, which holds a substantial amount of the Company's Class A and Class B common stock. Defendant Knight solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Graf, Henry, Parker, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Knight solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Henry, Parker, Peluso, Rogers, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Knight received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, Defendant Knight conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Knight faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

282.    Additional reasons that demand on Defendant Parker is futile follow. Defendant Parker is the Executive Charmain of the Board and has served as a Company director since 2006. He previously served as the Company's President and CEO from 2006 until January 2020.

Additionally, Defendant Parker serves as the Chair of the Executive Committee. Defendant Parker solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Graf, Henry, Knight, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Parker solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Henry, Knight, Peluso, Rogers, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Parker received and continues to receive handsome compensation for his role as a director described above. As a trusted Company director, Defendant Parker conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading, obtaining staggering personal profits of approximately ***$196,624,437*** for trading personal holdings of Nike Class B common stock while the stock was trading at artificially inflated prices because of the Individual Defendants causing the Company to issue false and misleading statements. For these reasons, Defendant Parker faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

283.    Additional reasons that demand on Defendant Peluso is futile follow. Defendant Peluso has served as a Company director since 2014. She also serves as the Chair of the

Sustainability & Governance Committee and as a member of the Corporate Responsibility Committee. Defendant Peluso solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Graf, Henry, Knight, Parker, Rogers, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Peluso solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Henry, Knight, Parker, Rogers, Swan, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Peluso received and continues to receive handsome compensation for this role as a director described above. As the trusted Company director, Defendant Peluso conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Peluso faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

284.    Additional reasons that demand on Defendant Rogers is futile follow. Defendant Rogers has served as a Company director since 2018. He also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. Defendant Rogers solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Graf, Henry,

Knight, Parker, Peluso, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. In addition, Defendant Rogers solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Swan, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Rogers received and continues to receive handsome compensation for this role as a director described above. As the trusted Company director, Defendant Rogers conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Rogers faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

285.    Additional reasons that demand on Defendant Swan is futile follow.  Defendant Swan has served as a Company director since 2022. He also serves as a member of the Audit & Finance Committees. Defendant Swan solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Benko, Cook, Donahoe, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Defendant Swan received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, Defendant Swan conducted little, if any, oversight of the

schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Swan faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

286.    Additional reasons that demand on the Board is futile follow.

287.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $3.5 billion for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

288.    Defendants Benko, Henry, and Swan (the "Audit & Finance Committee Defendants") and nonparty Maria Henry served as members of the Audit & Finance Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit & Finance Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately

exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit & Finance Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

289.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

290.    Nike has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Nike any part of the damages Nike suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

291.    The acts complained of herein constitute violations of fiduciary duties owed by Nike's officers and directors, and these acts are incapable of ratification.

292.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit & Finance Committee Charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

293.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nike. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Nike, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

294.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Nike to sue the Individual Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

295.    Thus, for all the reasons set forth above, all the Director-Defendants, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

296.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

298.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

299.    Under the direction and watch of Defendants Donahoe, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso, and Rogers, the 2021 and 2022 Proxy Statements failed to disclose: (1) through the Company claimed its officers and directors adhered to the Code of

Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 and 2022 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

300.    The 2021 and 2022 Proxy Statements failed to disclose that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls.

301.    In exercise of reasonable care, Defendants Donahoe, Friend, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso, and Rogers, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 and 2022 Proxy Statements were materially false and misleading.

302.    The Company was damaged as a result of Defendants Donahoe, Friend, Benko, Cook, Duckett, Graf, Henry, Knight, Parker, Peluso, and Rogers material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

303.    Under the direction and watch of Defendants Donahoe, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan, the 2023 Proxy Statement failed to disclose: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately

exercising these functions and were causing or permitting the Company to issue false and misleading statements.

304.    The 2023 Proxy Statement failed to disclose that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls.

305.    In exercise of reasonable care, Defendants Donahoe, Friend, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.

306.    The Company was damaged as a result of Defendants Donahoe, Friend, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Parker, Peluso, Rogers and Swan material misrepresentations and omissions in the 2023 Proxy Statement.

307.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

## <u>SECOND CLAIM</u>
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

308.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

309.    The Individual Defendants, by virtue of their positions with Nike and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Nike and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and

influence and exercised the same to cause Nike to engage in the illegal conduct and practices complained of herein.

310.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

311.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

312.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Nike. Not only is Nike now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Nike by the Individual Defendants. Defendants caused by the Company to repurchase more than 106,889,217 of its own shares at artificially inflated prices, damaging Nike.

313.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Nike not misleading.

314.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Nike.

315.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

316.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

317.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

318.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

319.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nike's business and affairs.

320.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

321.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nike.

322.    In breach of their fiduciary duties owed to Nike, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed

to disclose, *inter alia*, that: (1) the Company's Consumer Direct Offense Strategy could not grow revenue sustainably; (2) the Company's "strong competitive advantages" over competing companies could not shield Nike from strong competitive pressures after Nike largely abandoned its wholesale and retail partners in favor of the direct-to-consumer strategy; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

323.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

324.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

325.    In yet further breach of fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase more than a 106 million shares of its own common stock at artificially inflated prices before the fraud was exposed.

326.    In yet further breach of fiduciary duties, during the Relevant Period, Defendants Friend, Henry, and Parker engaged in staggering insider sales, netting collective proceeds of approximately $211,339,280 while the price of the Company's Class B common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

327.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

328.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

329.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nike has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

330.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

331.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

332.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nike.

333.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Nike that was tied to the performance or artificially inflated valuation of Nike, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

334.    Plaintiff, as a shareholder and representative of Nike, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

335. Plaintiff, on behalf of Nike, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

336. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

337. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Nike, for which they are legally responsible.

338. As a direct and proximate result of the Individual Defendants' abuse of control, Nike has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Nike has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

339. Plaintiff, on behalf of Nike, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

340. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

341. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Nike in a manner consistent with the operations of a publicly held corporation.

342.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Nike has sustained and will continue to sustain significant damages.

343.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

344.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

345.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

346.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

347.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

348.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

349.    Plaintiff, on behalf of Nike, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Donahoe and Friend for Contribution Under Sections 10(b) and Section 21D of the Exchange Act

350.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

Page 96 – VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2625489

351. Nike and Defendants Donahoe and Friend are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Donahoe and Friend's willful and/or reckless violations of their obligations as officers and/or directors of Nike.

352. Defendants Donahoe and Friend because of their positions of control and authority as officers and/or directors of Nike, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Nike, including the wrongful acts complained of herein and in the Securities Class Action.

353. Accordingly, Defendants Donahoe and Friend are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

354. As such, Nike is entitled to receive all appropriate contribution or indemnification from Defendants Donahoe and Friend.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Nike, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nike;

(c)     Determining and awarding to Nike the damages sustained by it as a result

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Nike and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nike and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Nike to nominate at least four candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Nike restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


DATED this 24th day of July, 2024.

BLACK HELTERLINE LLP


By:  s/ Michael B. Merchant
Michael B. Merchant
OSB No. 882680
(503) 224-5560

*Liaison Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*